USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: __08/31/2021__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x
BURBRAN PIERRE, *on behalf of himself and others similarly situated*,

         Plaintiff,

   -against-

CITY OF NEW YORK, ET AL.,

         Defendants.
------------------------------------------------------------------- x

20-cv-5116 (ALC)

**OPINION & ORDER**

**ANDREW L. CARTER, JR., District Judge:**

  Plaintiff Burbran Pierre (hereinafter, "Plaintiff" or "Mr. Pierre"), on behalf of himself and others similarly situated, brings claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, New York Labor Law ("NYLL"), N.Y. Lab. Law §§ 190 *et seq.* and in the alternative, the Freelance Isn't Free Act ("FIFA"), N.Y.C. Admin. Code §§ 20-927 *et seq.*, against TD Bank N.A. ("TD Bank"), Duane Reade Inc. ("Duane Reade"), B&H Photo Video Pro Audio LLC ("B&H"), Bloomberg L.P. ("Bloomberg"), Whole Foods Market Group, Inc. ("Whole Foods") (collectively, "Vendor Defendants"), as well as the City of New York and the New York Police Department (collectively, "NYPD," and together with Vendor Defendants, "Defendants").[1] TD Bank and Duane Reade moved to dismiss all claims against them, while the rest of the Vendor Defendants moved to dismiss only the FIFA claim. For the reasons discussed below, the Vendor Defendants' motion is **DENIED**.

---

[1] Plaintiff also brought claims against Trihop 14th Street LLC, but that Defendant has yet to appear in the case.

1

## BACKGROUND

I. **Factual Background**[2]

    A. **NYPD's Paid Detail Program ("PDP")**

This case arises from the NYPD's Paid Detail Program ("PDP") through which the NYPD staffs Police Officers, Detectives, Sergeants, and Lieutenants (collectively, "Officers") at private businesses throughout New York City to perform off-duty uniformed security work for hourly pay. ECF No. 1 ("Compl.") ¶¶ 1, 70. This program was created in the Spring of 1998 and its primary purpose is to provide a highly visible police presence at participating businesses. *Id.* ¶¶ 68-69; *see also* ECF No. 1-2 at 3; ECF No. 1-3 at 3. The PDP is the only authorized program that allows businesses to employ unformed off-duty Officers. Compl. ¶ 71. Through the PDP, Officers are assigned to work at various businesses, including, *inter alia*: (i) retail chains; (ii) department stores; (iii) supermarkets; (iv) houses of worship; (v) sports complexes; (vi) banks; and (vii) office buildings. *Id.* ¶ 73; *see also* ECF No. 1-3 at 3.

        1. **Approving Businesses to Participate in the PDP**

The NYPD must approve a business before it can participate in the PDP. Compl. ¶ 75. While any event planner, corporation or interested organization can participate, there are several exceptions, including government and quasi-governmental entities, among others. *Id.* ¶¶ 77-78; *see also* ECF No. 1-3 at 3. "In all other circumstances, however, the NYPD reserves the right to decide participation of its police officers." ECF No. 1-3 at 3. Prospective vendors are required to

---

[2] When determining whether to dismiss a case, the court accepts as true all well-pleaded factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). Furthermore, "[a] complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (internal citations omitted). Pursuant to these standards, this recitation of facts is based on Plaintiff's Complaint, attached Exhibits, as well as the Participation Agreements filed by the Vendor Defendants, which the Court previously determined were integral to the Complaint. ECF No. 56.

provide certain information requested by the NYPD and go through a general background and credit check. Compl. ¶¶ 79-80; *see also* ECF No. 1-3 at 3. After the NYPD reviews that information, they require prospective vendors to sign a formal Participation Agreement and provide a certificate of insurance. Compl. ¶ 81. The Participation Agreement outlines the specifics of the program. ECF No. 1-3 at 3; *see also* ECF No. 52-4 ("Participation Agreement").[3] The Commissioner reviews the signed Participation Agreement and certificate of insurance before granting or denying final approval. Compl. ¶ 82.

### 2. Approving Officers to Participate in the PDP

Officers must also get approval from the NYPD to participate in the PDP. *Id.* ¶ 83; *see also* ECF No 1-2 at 2. In order to qualify, Officers must meet various criteria, including, *inter alia*, possessing more than one year of service in the NYPD and maintaining full duty status throughout the duration of the Officer's participation in the PDP. Compl. ¶ 84. Officers who are considered chronically ill, on performance monitoring or in possession of "position limitations" are excluded from the program. *Id.* ¶ 85. In order to sign up, Officers must submit an application signed by their commanding officer and a signed W-9 form which includes their social security number. *Id.* ¶ 87; *see also* ECF No. 1-2 at 2. These materials are submitted to the Paid Detail Unit ("PDU"). ECF No. 1-2 at 2. The NYPD keeps the W-9 on file in case it is requested by a particular vendor. *Id.* They also maintain authority to unilaterally remove an officer if they are promoted, transferred or placed on monitoring. Compl. ¶ 89; *see also* ECF No 1-2 at 2.

### 3. Direction and Control of PDP Details

The NYPD maintains and operates a Paid Detail Intranet Assignment System which can be accessed via any NYPD Intranet Terminal. ECF No. 1-2 at 5; Compl. ¶ 91. Officers can use

---

[3] The Participation Agreements filed by the Vendor Defendants are substantially the same, with minor differences not relevant here.

this website to see what details are available and confirm assignment selections. ECF No. 1-2 at 5. The website can also be used to cancel a previously selected detail, as long as the detail is more than 24 hours away. *Id.* If the detail is less than 24 hours away, the Officer must call the PDU to cancel. *Id.* The NYPD controls when businesses may schedule Officers for details which can last anywhere between four and twelve hours. Compl. ¶ 92; ECF No. 1-2 at 3. The NYPD also evaluates each requested detail and determines how many Officers (including in a supervisory capacity) are necessary based on security and safety considerations. Compl. ¶ 93; ECF No. 1-3 at 3.

The NYPD also controls and determines what officers are assigned to specific details, when Officers may accept details and the number of hours per month Officers may work these details. Compl. ¶ 94; *see also* ECF No. 1-3 at 3 (noting that the PDU makes specific assignments). Officers are not permitted to accept any detail assignment within one hour of the conclusion of their regularly scheduled non-PDP tour, nor work any detail assignment within three hours of the start of their regularly scheduled non-PDP tour. ECF No. 1-2 at 3; Compl. ¶¶ 97-98. To ensure compliance with this requirement, the NYPD requires that Officers enter their tour information (last and next scheduled on duty-tour) on a Paid Detail Card which must be presented to the vendor representative for signature. ECF No. 1-2 at 3-4; Compl. ¶ 99. The original (white) copy must be signed by a designated NYPD supervisor, while the second (blue) copy is retained by the vendor for payroll purposes. ECF No. 1-2 at 4. The Officer must also sign out on the NYPD Paid Detail Attendance Sheet. *Id.* Police Officers and Detectives are limited to a maximum of 80 hours per month, while Sergeants and Lieutenants are limited to a maximum of 30 hours per month. *Id.* at 2; Compl. ¶¶ 95-96. Further, Officers are not allowed to trade PDP details with each other. Compl. ¶ 100. Officers who either request PDP details on behalf of other Officers or perform PDP details

assigned to another Officer without prior authorization are suspended from the PDP program by the NYPD. *Id.* ¶ 101. In addition to canceling previously scheduled details on the Paid Detail Intranet Assignment System, Officers must also provide documentation to their NYPD supervisors. *Id.* ¶ 102. Failure to do so can result in being deemed ineligible for future PDP assignments. *Id.* ¶ 103. The NYPD also prohibits Officers from working for participating businesses, including Vendor Defendants, outside of the PDP. *Id.* ¶ 104. Officers who schedule details directly with participating businesses are disciplined and deemed ineligible for future PDP assignments. *Id.* ¶ 105.

### 4. Control Over Officers' Physical Appearance During PDP Details

The NYPD mandates that Officers on PDP details wear their full NYPD uniform, including vest, eight-point cap, baton and escape mask, and prohibits Officers from wearing baseball caps, raid jackets, bags or any other non-uniform gear or apparel. *Id.* ¶¶ 108-109; ECF No. 1-2 at 3. The NYPD also mandates that Officers conform to all NYPD grooming and appearance standards applicable to Officers on non-PDP tours. Compl. ¶ 110; ECF No. 1-2 at 3. This is subject to inspection by an NYPD supervisor. Compl. ¶ 112; ECF No. 1-2 at 3. Furthermore, the NYPD requires Officers to bring an NYPD-issued radio and activity logs on their PDP assignments. Compl. ¶ 111; ECF No. 1-2 at 3.

### 5. Control Over Officers' Work During PDP Details

Upon arrival at a participating business, the NYPD directs Officers to report to a vendor representative or to an NYPD ranking Officer supervising the detail. Compl. ¶ 114; ECF No. 1-2 at 3. The NYPD also directs Officers to sign in on the NYPD Paid Detail Attendance Sheet as well as any additional log kept by the vendor. Compl. ¶ 115; ECF No. 1-2 at 3. The NYPD cautions Officers that "[a]lthough [they] will be working directly for the vendor [they] are subject at all

times to NYPD rules and regulations including but not limited to courtesy and contact with the public." ECF No. 1-2 at 3; Compl. ¶ 116. "Should an arrest become necessary, or if [they] become injured as a result of taking police action," the Officer is instructed to "notify an on-duty police supervisor . . . who will determine further action." ECF No. 1-2 at 3; Compl. ¶ 118. At the end of the detail, the NYPD directs Officers to present their Paid Detail Card to the vendor representative for signature (which also requires a signature by the Officer's designated supervisor) and to sign out on the NYPD Paid Detail Attendance Sheet. Compl. ¶ 119; ECF No. 1-2 at 4. While vendors may request that the Officer remain beyond the scheduled end of the paid detail, the Officer is not obligated to stay. ECF No. 1-2 at 3. If they do elect to stay, the NYPD directs the Officer to call the NYPD the next business day so they can reconcile their records. *Id.* at 3-4.

The NYPD also instructs vendors that they should report any breach of NYPD standards or vendor instructions to the PDU. *Id.* at 4; Compl. ¶¶ 120-21. Further, any Officers who fail to follow any NYPD rules or regulations may be banned from returning to a specific vendor, suspended from eligibility, or dropped from the PDP. ECF No. 1-2 at 4; Compl. ¶ 122. Plaintiff alleges that these same disciplinary measures apply to Officers who fail to follow vendor instructions. Compl. ¶ 122.

### 6. Control Over Officers' Wages

The NYPD establishes uniform hourly rates based on each Officer's rank. Compl. ¶ 124. These are included in the Paid Detail Guidelines, ECF No. 1-2 at 2; the Paid Details Pamphlet, ECF No. 1-3 at 2; and the Participation Agreements between the NYPD and the vendors, Participation Agreement at 2.[4] The NYPD has set the following rates:

---

[4] The Participation Agreement also includes the rate for Captain and above: $73 per hour. Participation Agreement at 2.

6

| Rank | Hourly Rate | Admin. Fee Per Hour | Total |
|---|---|---|---|
| Police Officer/ Detective | $41.00 | $4.10 | $45.10 |
| Sergeant | $51.00 | $5.10 | $56.10 |
| Lieutenant | $57.00 | $5.70 | $62.70 |

Compl. ¶¶ 125-130. The NYPD mandates that officers performing PDP details be classified as independent contractors. *Id.* ¶ 131. At the end of the year, Officers participating in the PDP receive an IRS Form 1099 from each vendor (as opposed to a W-2). *Id.* ¶ 132. While Officers provide W-9s to the PDU along with their application for the program, which are kept on file in case a vendor requests it, ECF No. 1-2 at 2, the NYPD also advises Officers that "[c]ertain vendors may require preparation of a W-9 form at the time of the detail from members who has [sic] not worked there before." *Id.* at 4. The NYPD directs that Officers use 1 Police Plaza, New York, NY 10038, and not their home address on this form. *Id.*; Compl. ¶ 133.

Notably, the NYPD administers payment to the Officers through the PDU and does not permit vendors to pay Officers directly. *Id.* ¶¶ 134-35. Specifically, vendors make checks out to the Officers, but these are sent to the PDU, who then send them to the Officers. ECF No. 1-2 at 4. The NYPD instructs the Officers that if they have not received a check after eight weeks, to contact the PDU who will address the matter with the vendor, and not to contact the vendor directly. *Id.* Further, the Participation Agreement between the vendor and the NYPD states that if payment is not received by the PDU within thirty (30) days of the paid detail, "the Vendor shall be considered delinquent and subject to all remedies at law." Participation Agreement at 6.

### 7. Vendors' Participation in the PDP

Plaintiff alleges that once a business (including Vendor Defendants) obtains approval to participate in the program, it coordinates with the NYPD to assess how many Officers the business needs to staff a particular PDP detail. Compl. ¶ 136; *cf.* Participation Agreement at 4 ("The Department may set staffing levels, for the safety and supervision of police officers at its

7

discretion."). Further, these businesses "direct and control" the dates Officers work on PDP details. *Id.* ¶ 137. Businesses post solicitations on the PDP portal which Officers can view and accept. *Id.* ¶ 138. The businesses also agree to pay Officers at the uniform hourly rates set forth in the PDP. *Id.* ¶ 139; *see also* Participation Agreement at 2. The businesses agree to follow the payment procedures set by the NYPD. *Id.* at 4-6. Specifically, businesses agree to send checks to the PDU within 14 days of the work performed, indicating when and where the service was performed. *Id.* at 5. The NYPD also directs businesses issue 1099's to the Officers, by name, in care of the PDU. *Id.* The PDU is then responsible for forwarding these forms to the Officers. *Id.* at 5-6. The Participation Agreement also states that the businesses agree to accept information contained on the Paid Detail Card in lieu of a form W-9, and the Paid Detail Card as an invoice for officer payment and associated administrative fee. *Id.* at 6. Further, the NYPD mandates that the business "safeguard and treat the [] copy as it would any other business document, instrument, or invoice." *Id.* When signing the Participation Agreement, the businesses also agree that authorized personnel will be designated to sign an Officer's Paid Detail Card at the end of the Officer's shift. *Id.* The businesses also agree to maintain on premises a sign-in/sign-out log, provided by the NYPD and to keep these records for at least a year. *Id.* Businesses agree to make these logs available for inspection by the NYPD. *Id.* Lastly, businesses agree not to contact Officers directly or "augment a paid detail assignment" and are explicitly prohibited from "formulating details or scheduling assignments except through the Paid Detail Unit." *Id.* at 3.

Plaintiff also alleges that businesses direct Officers to the exact location where they are to work throughout the entire detail and that they determine the meal and break policies for Officers and dictate the circumstances under which an Officer may intervene. Compl. ¶¶ 141-42. Additionally, according to Plaintiff, businesses require Officers to report their work in Activity

8

Logs at pre-determined intervals. *Id.* ¶ 143; *but cf.* ECF No. 1-2 at 3(NYPD mandating an Activity Log entry at the beginning and end of each paid detail, as well as any time an Officer takes official police action). TD Bank also allegedly requires Officers to make entries in their Activity Log every thirty minutes. Compl. ¶ 144; *but cf.* ECF No. 1-2 at 3 ("[A]ll members performing paid details at TD Bank locations are required to make thirty minute entries in their ACTIVITY LOG."). Further, Plaintiff alleges that businesses subject Officers to discipline and report Officers to the NYPD for failing to follow the business's policies as well as those of the NYPD. Compl. ¶¶ 145-46. Plaintiff alleges that businesses control the staffing of Officers "insofar as they may decline an Officer who accepts a detail through the PDP portal" and that they also possess "the power to extend an Officer's PDP detail past its schedule [sic] end time." *Id.* ¶¶ 147-48; *but cf.* ECF No. 1-2 at 3 (noting that if vendor asks Officer to stay past the scheduled end of the paid detail, Officers may do so, but are not obligated to).

### B. Defendants' Conduct

According to Plaintiff, "Defendants routinely fail to pay Plaintiff and all other Officers for PDP details for weeks, and even months, after Officers complete PDP details." Compl. ¶ 152; *see also id.* ¶¶ 170-72 (allegations specific to B&H Photo); *id.* ¶¶ 176-78 (allegations specific to Whole Foods); *id.* ¶¶ 179-81 (allegations specific to Bloomberg); *id.* ¶¶ 182-85 (allegations specific to TD Bank); *id.* ¶¶ 186-88 (allegations specific to Duane Reade). Further, the NYPD and TD Bank "engage in a pattern and practice of denying Plaintiff and all other Officers minimum wages and all earned wages at their regular rates of pay." *Id.* ¶ 153; *see also id.* ¶¶ 190-92. "Upon information and belief, the other Vendors engage in a similar pattern and practice." *Id.* ¶ 157. Plaintiff also alleges that the Vendor Defendants never provided Plaintiff or any other Officer with Notices of

9

Pay Rate or accurate wage statements throughout the statutory period. *Id.* ¶¶ 159, 161; *see also id.* ¶¶ 194-95.

### C. Plaintiff Burbran Pierre

Mr. Pierre was hired by the NYPD as a Police Officer on or around July 10, 2010. *Id.* ¶ 162. In or around February 2012, Plaintiff applied to participate in the PDP. *Id.* ¶ 163. On or around March 30, 2012, Plaintiff worked his first PDP detail at TD Bank. *Id.* ¶ 164. In total, Plaintiff has worked approximately 63 PDP details for Defendants. *Id.* ¶ 165.[5]

## II. Procedural History

Plaintiff commenced this action on July 3, 2020. ECF No. 1. On September 18, 2020, Defendants City of New York and NYPD filed an Answer to Plaintiff's Complaint. ECF No. 41. That same day the Vendor Defendants requested a pre-motion conference in connection with their anticipated motion to dismiss, ECF No. 42, and Plaintiff responded on October 9, 2020, ECF No. 48. The Court held a pre-motion conference on November 17, 2020. ECF No. 49. Thereafter, the Court ordered the Vendor Defendants to file the Participation Agreements referenced in their pre-motion conference letter and to file a joint status report addressing the parties' positions on whether the Participation Agreement would properly be considered at the motion to dismiss stage. ECF No. 50. The Vendor Defendants filed the requested Participation Agreements on November 19, 2020. ECF No. 52. The parties filed the requested joint status report on December 1, 2020. ECF

---

[5] Exhibit D attached to Plaintiff's Complaint shows that from March 30, 2012, when he completed his first PDP detail at TD Bank, through March 6, 2020, Plaintiff completed approximately 84 details. ECF No. 1-4. Out of these details, approximately 28 were at Duane Reade (multiple locations), approximately 24 were at TD Bank (multiple locations), approximately three were at B&H Photo, approximately two were at Whole Foods, and approximately two were at Bloomberg. *Id.* The remaining PDP details were completed for the Board of Elections at various schools, New York Presbyterian Hospital, Brookdale Hospital Medical Center, Boston Properties (multiple locations), Barnes & Noble (multiple locations), Rockefeller Center, and IHOP (Trihop). *Id.* Out of these, only Trihop is a Defendant in the instant action.

10

No. 55. On January 5, 2021, the Court held that it deemed the Participation Agreements "integral" to the Complaint and would thus consider them at the motion to dismiss stage. ECF No. 56.[6]

Vendor Defendants filed their motion to dismiss and supporting memorandum of law on February 9, 2021 ("Defs.' Mot."). ECF Nos. 60-61. Plaintiff filed his opposition brief ("Pl. Opp.") on March 16, 2021, ECF No. 65, and Vendor Defendants filed their reply brief ("Defs.' Reply") on March 30, 2021, ECF No. 67. The motion is deemed fully briefed. For the reasons discussed below, Vendor Defendants' motion to dismiss is **DENIED**.

## STANDARD OF REVIEW

When considering a motion to dismiss under Federal Rules of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is

---

[6] In addition to being integral to the Complaint, the Participation Agreements are also incorporated into the Complaint by reference as they are referenced multiple times in the Complaint and attached exhibits. *See, e.g.*, Compl. ¶¶ 81-82; ECF No. 1-3 at 3.

11

inapplicable to . . . threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555).

## DISCUSSION

The instant motion raises two issues: (1) whether Plaintiff has alleged that TD Bank and Duane Reade were his joint employers for purposes of the FLSA and the NYLL; and (2) whether Plaintiff has alleged that he was a freelance worker within the meaning of FIFA and/or that the Vendor Defendants were "hiring part[ies]" within the meaning of FIFA. The Court concludes that Plaintiff sufficiently alleged that TD Bank and Duane Reade were his joint employers for the purposes of the FLSA and the NYLL, but concludes that it need not reach Plaintiff's FIFA claim at this stage.

### I. Plaintiff Has Adequately Pleaded That TD Bank and Duane Reade Were His Joint Employers

The Court will first consider whether Plaintiff has adequately pleaded that TD Bank and Duane Reade were his joint employers under the FLSA and the NYLL.[7]

#### A. Legal Definition of "Employer"

The FLSA and NYLL define employment almost identically. *Compare* 29 U.S.C. § 203(g) ("'Employ' includes to suffer or permit to work."), *with* N.Y. Lab. Law § 2(7) ("'Employed' includes permitted or suffered to work."). Consequently, courts in this Circuit "hold that the New

---

[7] Duane Reade and TD Bank argue that Plaintiff's Complaint should be dismissed for improper "group pleading" and suggest that Plaintiff's Complaint does not provide Duane Reade or TD Bank with fair notice of the claims against them. Defs.' Mot. at 17. The Court disagrees. The cases cited to by Duane Reade and TD Bank are inapposite. *See Ying Li v. City of N.Y.*, 246 F. Supp. 3d 578, 598 (E.D.N.Y. 2017) (referring to defendants collectively was problematic where plaintiff was pursuing failure to intervene claims against all defendants and also alleging that defendants were all liable under a theory of direct participation, because plaintiff did not differentiate between defendants who participated directly in the unlawful conduct and those who failed to intervene in it); *Holmes v. Allstate Corp.*, No. 11-cv-1543, 2012 WL 627238, at *7 (S.D.N.Y. Jan. 27, 2012) (noting that plaintiffs' method of group pleading in a complaint which had few allegations that related to one defendant in particular, was "vague" and at times "incoherent and illogical"). Here, Plaintiff has more than adequately alleged the involvement of each Vendor Defendant and put Vendor Defendants on notice of the claims against them.

York Labor Law embodies the same standards for joint employment as the FLSA." *Paz v. Piedra,* No. 09-cv-03977, 2012 WL 12518495, at *5 (S.D.N.Y. Jan. 12, 2012) (quoting *Chen v. St. Beat Sportswear, Inc.,* 364 F. Supp. 2d 269, 278 (E.D.N.Y. 2005)).

In relevant part, FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . ." 29 U.S.C. § 203(d). "Because the statute defines employer in such broad terms," ultimately, it "offers little guidance on whether a given individual is or is not an employer." *Herman v. RSR Sec. Servs. Ltd.,* 172 F.3d 132, 139 (2d Cir.1999). Instead, FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles, in order to effectuate the remedial purposes of the act." *Barfield v. N.Y. City Health and Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (internal citations and quotation marks omitted). Accordingly, the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in "economic reality rather than technical concepts" determined by reference not to "isolated factors, but rather upon the circumstances of the whole activity." *Id.* (internal citations and quotation marks omitted). The goal of the economic reality test, and of this Court considering a finding of joint employment, is "expos[ing] outsourcing relationships that lack a substantial economic purpose, but it is manifestly not intended to bring normal, strategically-oriented contracting schemes within the ambit of the FLSA." *Zheng v. Liberty Apparel Co. Inc.,* 355 F.3d 61, 76 (2d Cir. 2003).

In *Carter v. Dutchess Community College*, the Second Circuit identified four factors relevant to the joint employment inquiry: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment

records." 735 F.2d 8, 12 (2d Cir. 1984) (internal citations and quotation marks omitted) (collectively, "*Carter* factors").

In *Zheng,* the Second Circuit acknowledged that while the *Carter* factors exemplify formal control, they might be inadequate to determine "the circumstances of the whole activity viewed in light of economic reality," 355 F.3d at 71 (internal citations and quotation marks omitted); *id.* at 69 ("We did not hold . . . that a positive finding on those four factors is *necessary* to establish an employment relationship," only that they "can be sufficient." (emphasis in original)) Thus, district courts should consider other factors as a measure of functional control (collectively, "*Zheng* factors"):

> (1) whether [the putative joint employer]'s premises and equipment were used for the plaintiffs' work; (2) whether the Contractor Corporations had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the putative joint employer]'s process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [putative joint employer] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the putative joint employer].

*Id.* at 72 (citations omitted).

Lastly, a court is "also free to consider any other factors it deems relevant to its assessment of the economic realities." *Id*. at 71-72.

### B. Application

Plaintiff has pleaded facts to at least satisfy the functional control test. Plaintiff alleges, *inter alia*, that (1) the Vendor Defendants "subject Officers to discipline and report [them] to the NYPD for failing to follow the business's policies," Compl. ¶ 145; (2) the Vendor Defendants "enforce NYPD standards in the same manner, by reporting Officers for failing to comply with the same," *id.* ¶ 146; (3) Officers "who fail to follow any [NYPD] or Paid Detail Unit rules or regulations may be banned from returning to a specific vendor, suspended from eligibility, or

14

dropped from the [PDP]," ECF No. 1-2 at 4; (4) the Vendor Defendants paid Plaintiff and other Officers by making out checks to them and also issued them 1099s, ECF No. 1-2 at 4; *see also* ECF No. 1-5; (5) the Vendor Defendants maintained certain employment records, including Paid Detail Cards, ECF No. 1-2 at 4; (6) Plaintiff and other Officers were sometimes required to report to a Vendor Defendant representative at the beginning of their PDP detail, Compl. ¶ 114; (7) at least some Vendor Defendants required Plaintiff and other Officers to fill out their Activity Logs at particular time intervals, ECF No. 1-2 at 3; (8) the Vendor Defendants "direct Officers to the exact location where they are to work throughout the PDP detail," Compl. ¶ 141; (6) the Vendor Defendants "determine the meal and break policies for Officers and dictate the circumstances under which an Officer may intervene," *id.* ¶ 142.

It is true that certain allegations in the Complaint, attached exhibits, and documents integral to the Complaint, suggest that the NYPD had complete control of certain aspects of Plaintiff's employment.[8] However, based on a "review of the totality of the circumstances," *Barfield*, 537 F.3d at 142, accepting all well pleaded factual allegations as true and drawing all inferences in Plaintiff's favor, the Court finds that Plaintiff has pleaded sufficient facts to suggest functional control, *see Olvera v. Bareburger Grp. LLC*, 73 F. Supp. 3d 201, 204 (S.D.N.Y. 2014) (explaining that a complaint only must "plead facts sufficient to allege a plausible claim that the [] defendants

---

[8] For example, contrary to Plaintiff's assertions in his opposition brief, the Complaint, attached documents, and documents integral to the Complaint do not support an inference that Vendor Defendants had the power to hire. As alleged, neither Duane Reade nor TD Bank had a role in who could participate in the PDP program or who specifically was assigned to TD Bank or Duane Reade. *See, e.g.*, Compl. ¶¶ 83-89 ("The NYPD . . . sets the parameters for Officers to participate in the PDP;" "NYPD employees must obtain approval from their commanders and submit a written application, as well as tax documentation, to be considered for participation in the PDP;" "the NYPD's Paid Detail Unit reviews each applicant's work record before approving him or her to participate in the PDP."); *see also* ECF No. 1-3 at 3 ("[T]he Paid Detail Unit makes specific [Officer] assignments."). Further, Vendor Defendants are not alleged to have determined rate of payment. Rather, Plaintiff alleges that the NYPD set the pay rate Vendor Defendants paid Officers working PDP details. *See, e.g.*, Compl. ¶ 139 ("Participating businesses, including the Vendors, each agree to pay Officers at the uniform hourly rates set forth in the PDP."). That being said, these allegations do not inter Plaintiff's FLSA and NYLL claims. *See Lanzetta v. Florio's Enters., Inc.*, 763 F. Supp. 2d 615, 627 (S.D.N.Y. 2011) ("[A] defendant need not satisfy any particular factor or all the factors to qualify as an employer." (internal citation omitted)).

were the plaintiffs' 'employers' under the FLSA and NYLL"). The cases relied on by TD Bank and Duane Reade do not preclude the Court's finding, as the majority of those cases were decided at the summary judgment stage, not on the pleadings. *See, e.g.*, *Jean-Louis v. Metro Cable Commc'ns, Inc.*, 838 F. Supp. 2d 111 (S.D.N.Y. 2011); *Lawrence v. Adderley Indus., Inc.*, No. 09-cv-2309, 2011 WL 666304 (E.D.N.Y. Feb. 11, 2011); *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404 (S.D.N.Y. 2017); *Vasto v. Credico (USA) LLC*, No. 15-cv-9298, 2017 WL 4877424 (S.D.N.Y. Oct. 27, 2017); *Godlewska v. HDA*, 916 F. Supp. 2d 246 (E.D.N.Y. 2013); *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683 (D. Md. 2010).[9] While Plaintiff may ultimately fail to prove that Vendor Defendants, including TD Bank and Duane Reade, were Plaintiff's joint employers under the FLSA and the NYLL, Plaintiff's Complaint has set forth enough allegations to survive a motion to dismiss, and Plaintiff is thus entitled to test his claims in discovery.

## II. The Court Need Not Consider Plaintiff's FIFA Claims at This Time

Plaintiff has asserted his FIFA claim in the alternative, and as Vendor Defendants appear to recognize, this claim can only be sustained if his FLSA and NYLL claims are dismissed. Because these claims have been upheld, it is not necessary to reach Plaintiff's FIFA claim at this stage. *See LaSalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc.*, No. 02-cv-7868, 2003 WL 21671812, at *5 (S.D.N.Y. July 16, 2003).

---

[9] While the Vendor Defendants cite to cases that were decided at the motion to dismiss stage, these are distinguishable. *See Hugee v. SJC Grp., Inc.*, No. 13-cv-423, 2013 WL 4399226 (S.D.N.Y. Aug. 14, 2013) (granting motion to dismiss as to one defendant where plaintiff conceded that a different defendant had the power to hire and fire employees and failed to put forth any evidence that the defendant at issue had the authority to hire and fire him; where alleged supervision and control of work schedules or conditions of employment was solely related to quality control and defendant at issue had explicitly disclaimed supervisory authority; where a different defendant informed him of his rate of pay and issued his paychecks; and where documents maintained were not alleged to be maintained for anything beyond quality control purposes); *Diaz v. Consortium for Worker Educ., Inc.*, No. 10-cv-1848, 2010 WL 3910280 (S.D.N.Y. Sept. 28, 2010) (complaint contained "no facts that indicate[d] that [defendant] had any direct role in managing the plaintiffs, hiring or firing the plaintiffs, determining their work hours, or maintaining employment records"); *Tracy v. NVR, Inc.*, 667 F. Supp. 2d 244 (W.D.N.Y. 2009) (motion to dismiss granted where complaint contained "mere boilerplate allegations . . . stated solely upon information and belief and without any supporting details").

## CONCLUSION

For the reasons herein, Vendor Defendants' motion to dismiss is **DENIED**. The Clerk of Court is respectfully directed to terminate ECF No. 60. The case shall be referred to the assigned Magistrate Judge forthwith.

**SO ORDERED.**

**Dated: August 31, 2021**
        **New York, New York**

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**