**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BURBRAN PIERRE, on behalf of himself and others similarly situated,

       *Plaintiffs*,

    v.

CITY OF NEW YORK, NEW YORK CITY PO-LICE DEPARTMENT, TD BANK N.A., DUANE READE INC., B & H PHOTO VIDEO PRO AU-DIO LLC, BLOOMBERG L.P., TRIHOP 14TH STREET LLC, DOES NOS. 1-10, SILVERSEAL CORPORATION d/b/a S.E.A.L. SECURITY LLC, and GARDAWORLD SECURITY CORPORA-TION d/b/a GARDAWORLD,

       *Defendants*.

Case No. 1:20-cv-05116-ALC-VF

---

## MEMORANDUM OF LAW IN SUPPORT OF MOTION BY DEFENDANTS BLOOMBERG L.P. AND GARDAWORLD SECURITY CORPORATION FOR SUMMARY JUDGMENT

ANTHONY A. MINGIONE
BLANK ROME
1271 Avenue of the Americas
New York, New York  10020
Tel:  212.885.5246
anthony.mingione@blankrome.com

*Counsel for Defendant GardaWorld
Security Corporation*

PAUL DECAMP
  Admitted *Pro Hac Vice*
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street, N.W., Suite 700
Washington, D.C.  20037
Tel:  202.861.1819
Fax: 202.861.3571
PDeCamp@ebglaw.com


ADRIANA S. KOSOVYCH
EPSTEIN BECKER & GREEN, P.C.
875 Third Avenue
New York, New York  10022
Tel:  212.351.4500
Fax: 212.878.8600
AKosovych@ebglaw.com

*Counsel for Defendant Bloomberg L.P.*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

FACTS ................................................................................................................................. 2

I.     NYPD'S PAID DETAIL PROGRAM ......................................................................... 2

    A.  Officer Participation in the PDP .................................................................. 3

    B.  Bloomberg's Participation in the PDP ......................................................... 4

    C.  GardaWorld's Non-Participation in the PDP ............................................. 6

II.    NYPD CONTROL OVER OFFICERS PROVIDING PAID
      DETAIL SERVICES ................................................................................................ 7

    A.  The NYPD Controls the Scheduling of Paid Details. ............................... 7

    B.  The NYPD Is Solely Responsible for Training Officers and
        Supervising Officers on Paid Details. ......................................................... 9

    C.  The NYPD Controls Officers' Physical Appearance and
        Equipment During Paid Details. ................................................................. 13

    D.  Only the NYPD May Discipline or Suspend Officers. .............................. 14

    E.  The NYPD Sets the Form and Manner of Payment to
        Officers for Paid Details. ............................................................................ 15

    F.  Neither Bloomberg Nor GardaWorld Maintain Employment
        Records for Officers. ................................................................................... 16

III.   PLAINTIFF BURBRAN PIERRE AND OPT-IN PLAINTIFFS ......................................... 18

IV.   PROCEDURAL HISTORY ..................................................................................... 18

LEGAL STANDARD .......................................................................................................... 20

ARGUMENT ...................................................................................................................... 20

I.    OPT-IN PLAINTIFFS WHO NEVER WORKED A PAID DETAIL AT BLOOMBERG
     HAVE NO VIABLE CLAIMS AGAINST BLOOMBERG OR GARDAWORLD, AND
     OPT-IN PLAINTIFFS WHO WORKED PAID DETAILS AT BLOOMBERG BEFORE
     MAY 20, 2022, HAVE NO CLAIMS AGAINST GARDAWORLD. .............................. 20

II.    THE UNDISPUTED FACTS DEMONSTRATE THAT BLOOMBERG
      AND GARDAWORLD DID NOT EMPLOY PLAINTIFFS ............................................. 21

    A.  The Economic Realities Test Determines Joint Employer Status. .......................... 22

    B.  Plaintiffs Cannot Create Issues of Fact With Errata Sheets Substantively
        Changing or Contradicting Their Deposition Testimony ..................................... 24

i

C.   Neither Bloomberg Nor GardaWorld Exercises Formal Control Over Plaintiffs. ......................................................................27

  1.   Bloomberg and GardaWorld Do Not Have the Power to Hire or Fire Plaintiffs. .............................................................27

  2.   Bloomberg and GardaWorld Do Not Control Plaintiffs' Work Schedules or Terms and Conditions of Employment. .....................................29

  3.   Bloomberg and GardaWorld Did Not Determine Plaintiffs' Rate or Method of Payment. .................................................30

  4.   Bloomberg and GardaWorld Do Not Maintain Plaintiffs' Employment Records..............................................................31

D.   Neither Bloomberg Nor GardaWorld Has Exercised Functional Control Over Plaintiffs. ....................................................32

  1.   Plaintiffs Primarily Use NYPD Equipment To Perform Paid Detail Work.....................................................................32

  2.   The NYPD and Plaintiffs Freely Provided Paid Detail Services To Numerous Other Businesses Through the PDP...........................33

  3.   Plaintiffs Did Not Perform A Discrete Line Job Integral to Bloomberg's Business. ...................................................34

  4.   Transfer of Responsibility....................................................36

  5.   Neither Bloomberg Nor GardaWorld Has Supervised the Paid Detail Work of Plaintiffs and Other Officers.........................37

  6.   Plaintiffs and Other Officers Do Not Exclusively or Predominantly Work for Bloomberg or GardaWorld Through the PDP. ...............40

E.   All of the Formal and Functional Control Factors Weigh Against a Finding of Joint Employment.................................................41

III.   SUMMARY JUDGMENT IN BLOOMBERG'S AND GARDAWORLD'S FAVOR, AND ALTERNATIVELY, DISMISSAL, IS WARRANTED AS TO PLAINTIFFS' FIFA CLAIMS. ...................................................................42

A.   The FIFA Claims Fail Because Bloomberg and GardaWorld Are Not Hiring Parties and NYPD Officers Are Not Freelance Workers. ...................42

B.   Alternatively, Upon Granting Summary Judgment on the FLSA Claims, This Court Should Decline to Exercise Supplemental Jurisdiction Over the FIFA Claims. .......................................45

CONCLUSION ...............................................................................45

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amarosa v. Am. Nat'l Red Cross*,
   No. 11-CV-3289(DRH)(WDW), 2014 WL 3696255 (E.D.N.Y. July 24, 2014)......................27

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..................................................................................................................20

*Arce v. Sovereign Indus. Grp. Inc.*,
   No. 19-CV-489(NGG)(JRC), 2025 WL 102449 (E.D.N.Y. Jan. 15, 2025) ..........22, 24, 30, 40

*Arce v. Sovereign Indus. Grp. Inc.*,
   No. 19-CV-489 (NGG)(JRC), Dkt. 134 (E.D.N.Y. June 14, 2024) ......................29, 30, 31, 37

*Barfield v. N.Y.C. Health & Hosps. Corp.*,
   537 F.3d 132 (2d Cir. 2008)................................................................................................22, 23

*Barnes v. Ross*,
   No. 12 Civ. 1916(PKC), 2014 WL 1329128 (S.D.N.Y. Apr. 3, 2014) .............................26, 27

*Bojaj v. Moro Food Corp.*,
   No. 13 Civ. 9202, 2014 WL 6055771 (S.D.N.Y. Nov. 13, 2014) ...........................................20

*Carter v. Dutchess Cmty. Coll.*,
   735 F.2d 8 (2d Cir. 1984).......................................................................................23, 29, 30

*Cavallaro v. UMass Mem'l Health Care, Inc.*,
   971 F. Supp. 2d 139 (D. Mass. 2013) .....................................................................................20

*Chen v. St. Beat Sportswear, Inc.*,
   364 F. Supp. 2d 269 (E.D.N.Y. 2005) .....................................................................................22

*Crumbling v. Miyabi Murrells Inlet, LLC*,
   192 F. Supp. 3d 640 (D.S.C. 2016).........................................................................................20

*Escoffier v. City of New York*,
   No. 13-CV-3918 (JPO), 2019 WL 4747666 (S.D.N.Y. Sept. 30, 2019) ................................26

*Gallo v. Prudential Residential Servs., Ltd.*,
   22 F.3d 1219 (2d Cir.1999)......................................................................................................20

*Gitter v. Target Corp.*,
   No. 14cv4460 (DLC), 2015 WL 5710454 (S.D.N.Y. Sept. 29, 2015) ...................1, 22, 33, 37

*Godlewska v. HDA*,
   916 F. Supp. 2d 246 (E.D.N.Y. 2013) ...........................................................25, 32, 35, 38, 39

*Greenawalt v. AT&T Mobility LLC*,
   642 F. App'x 36 (2d Cir. 2016) ..................................................................................23, 34, 36

*Greenway v. Int'l Paper Co.*,
   144 F.R.D. 322 (W.D. La. 1992) .............................................................................................26

*Hugee v. SJC Group, Inc.*,
   No. 13-CV-0423 (GBD), 2013 WL 4399226 (S.D.N.Y. Aug. 14, 2013)................................31

*Jacobson v. Comcast Corp.*,
   740 F. Supp. 2d 683 (D. Md. 2010)....................................................................................32, 39

*Jean-Louis v. Metro. Cable Comms., Inc.*,
   838 F. Supp. 2d 111 (S.D.N.Y. 2011)............................................................................. *passim*

*Lawrence v. Adderley Indus., Inc.*,
   No. CV-09-2309 (SJF)(ETB), 2011 WL 666304 (E.D.N.Y. Feb. 11, 2011)......................28, 32

*Martin v. Sprint United Mgmt. Co.*,
   273 F. Supp. 3d 404 (S.D.N.Y. 2017)......................................................................................30

*Martin v. Sprint United Mgmt. Co.*,
   No. 15 Civ. 5237 (PAE), 2017 WL 5028621 (S.D.N.Y. Oct. 31, 2017) .................................45

*Meyer v. U.S. Tennis Ass'n*,
   No. 1:11-cv-06268 (ALC)(MHD), 2014 WL 4495185
   (S.D.N.Y. Sept. 11, 2014).......................................................................................................20

*Monzano-Morano v. Libqual Fence Co.*,
   No. 18-CV-0161(MKB)(AKT), 2021 WL 730663
   (E.D.N.Y. Feb. 5, 2021) ................................................................................35, 37, 38, 42, 43

*Musto v. Transport Workers Union of America, AFL-CIO*,
   No. 03-CV-2325 (DGT) (RML), 2009 WL 116960 (E.D.N.Y. Jan. 16, 2009).................26, 27

*Ocampo v. 455 Hosp. LLC*,
   No. 14-CV-9614 (KMK), 2016 WL 4926204 (S.D.N.Y. Sept. 15, 2016) ..............................22

*Paz v. Piedra*,
   No. 09 Civ. 03977 (LAK) (GWG), 2012 WL 12518495
   (S.D.N.Y. Jan. 12, 2012)..........................................................................................................22

*Piney v. City of New York et al.*,
   No. 1:25-CV-671 (DEH) (SLC), Dkt. 631 (S.D.N.Y. Mar. 11, 2026) ...................................34

iv

*Podell v. Citicorp Diners Club, Inc.*,
    914 F. Supp. 1025 (S.D.N.Y.1996)....................................................................25, 26, 27

*Sampson v. MediSys Health Network, Inc.*,
    No. 10-CV-1342 (SJF) (ARL), 2012 WL 3027838 (E.D.N.Y. July 24, 2012) ......................23

*Shiflett v. Scores Holding Co.*,
    No. 13 Civ. 4076(NRB), 2014 WL 1413618 (S.D.N.Y. Apr. 10, 2014) ................................45

*Turner v. Sheppard Grain Enters., LLC*,
    127 N.Y.S.3d 260 (Sup. Ct. N.Y. Cnty. 2020) ...................................................................43, 44

*United Mine Workers v. Gibbs*,
    383 U.S. 715 (1966).........................................................................................................45

*Varn v. Orchestrade, Inc.*,
    No. 19-CV-2875 (MKB), 2022 WL 900855 (E.D.N.Y. Mar. 28, 2022) ................................42

*Vasto v. Credico (USA) LLC*,
    No. 15 Civ. 9298 (PAE), 2017 WL 4877424 (S.D.N.Y. Oct. 27, 2017) ....................29, 35, 38

*Wade Williams Distribution, Inc. v. Am. Broad. Companies, Inc.*,
    No. 00 CIV. 5002 (LMM), 2004 WL 1487702 (S.D.N.Y. June 30, 2004) .............................26

*Zheng v. Liberty Apparel Co. Inc.*,
    355 F.3d 61 (2d Cir. 2003)........................................................................................ *passim*

**Statutes**

Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ....................................................................1

    29 U.S.C. § 203(g) ..........................................................................................................22

    29 U.S.C. § 207(a)(1)........................................................................................................21

New York City Freelance Isn't Free Act, N.Y.C. Admin. Code §§ 20-927 *et seq.*..........................1

    N.Y.C. Admin. Code § 20-927 ................................................................................21, 42, 43

New York Labor Law, N.Y. Lab. L.§§ 1 *et seq.* ..........................................................................1

    N.Y. Lab. L. § 2(7) ..........................................................................................................22

    N.Y. Lab. L. § 195 ..........................................................................................................21

**Other Authorities**

12 N.Y.C.R.R. § 142-2.2 ......................................................................................................21

Federal Rules of Civil Procedure

Rule 30(e)................................................................................................................25, 26

Rule 56(a)....................................................................................................................20

Rule 56(c)....................................................................................................................20

Rule 56(e)....................................................................................................................20

Local Civil Rule 56.1......................................................................................................2

N.Y.C. Comm. On Consumer Affairs, N.Y.C. Council, Council Meeting Minutes
   at 3381 (Oct. 17, 2016) ...........................................................................................44

N.Y.C. Comm. on Consumer Affairs, N.Y.C. Council, Committee Report of the
   Governmental Affairs Division 3-4 (Oct. 26, 2016)................................................44

**INTRODUCTION**

This case turns on a straightforward question: who employed Plaintiffs when they performed paid details at Bloomberg L.P. ("Bloomberg") through the New York City Police Department's ("NYPD") Paid Detail Program?  The answer is the same for every Plaintiff and every paid detail shift: the NYPD, and *only* the NYPD.  Named Plaintiff Burbran Pierre and 1,363 opt-in plaintiffs (collectively, "Plaintiffs"), who are police officers employed by the NYPD, nevertheless seek to impose liability on Bloomberg and its security contractor GardaWorld Security Corporation ("GardaWorld") under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and New York Labor Law ("NYLL"), N.Y. Lab. Law §§ 1 *et seq.*, and, alternatively, under the Freelance Isn't Free Act ("FIFA"), N.Y.C. Admin. Code §§ 20-927 *et seq.*, based on off-duty uniformed detail work performed through an NYPD-administered program.

The undisputed evidentiary record forecloses Plaintiffs' FLSA and NYLL claims because only an "employer" can be held liable under those statutes, and Bloomberg and GardaWorld were not Plaintiffs' employers.  Bloomberg contracted with the NYPD, not with Plaintiffs; GardaWorld contracted with Bloomberg, not with Plaintiffs or the NYPD.  The NYPD alone set officer eligibility rules, controlled scheduling, assigned officers, trained officers, supervised officers' performance, prescribed uniforms and equipment, set pay rates and payment mechanics, and retained disciplinary authority.  This Court (albeit addressing different claims) has already found that the Paid Detail Program does not create an employer-employee relationship between police officers and the private entity receiving the service. *See Gitter v. Target Corp.*, No. 14cv4460 (DLC), 2015 WL 5710454, at *5-6 (S.D.N.Y. Sept. 29, 2015).  On this record, no reasonable factfinder could conclude that either Bloomberg or GardaWorld exercises the control required to establish an employment relationship.  Thus, summary judgment in their favor is appropriate.

Plaintiffs' fallback FIFA theory fails for the same reason.  Officers working NYPD-sanctioned paid details are not freelancers hired or retained by Bloomberg or GardaWorld; they are NYPD employees performing services through an NYPD-run program under NYPD control. Bloomberg did not engage Plaintiffs individually, and the Paid Detail Program falls well outside the scope of the freelance relationships FIFA was designed to protect.

Because the material facts are undisputed and establish the absence of any employment or freelance relationship between Bloomberg and GardaWorld, on the one hand, and Plaintiffs, on the other, the Court should grant summary judgment in favor of Bloomberg and GardaWorld.

## FACTS[1]

### I.    NYPD'S PAID DETAIL PROGRAM

The Paid Detail Program ("PDP") is a program through which off-duty police officers ("Officers") may sign up with the NYPD to perform a paid detail service for private entities. BB ¶ 1.  The PDP is the only authorized program for businesses to have Officers perform uniformed security work.  BB ¶ 2.  The primary purpose of paid details is to provide a highly visible police presence at specified locations, such as shopping malls, offices buildings, retail stores, hospitals, houses of worship, banks, and sports venues.  BB ¶ 3.

The NYPD sets strict parameters for business participation in the PDP.  BB ¶ 4.  To qualify, businesses are required to provide certain information requested by the NYPD.  BB ¶ 5.  The NYPD also performs a general background and credit check for each business.  BB ¶ 6.  After the NYPD reviews a business's responses, background information, and credit information, it requires

---

[1]    Bloomberg's Local Civil Rule 56.1 Statement of Undisputed Material Facts is referred to herein as "BB ¶ __."  GardaWorld's Local Civil Rule 56.1 Statement of Undisputed Material Facts is referred to herein as "GW ¶ __."  Exhibits attached to the Declaration of Adriana S. Kosovych are referred to herein as "Ex."

the business to sign a non-negotiable "Participation Agreement" and submit a certificate of insur-ance.  BB ¶ 7.  The NYPD Commissioner reviews the Participation Agreement and certificate of insurance before granting or denying final approval for the business to participate in the PDP.  BB ¶ 8.  The NYPD has expressly reserved its right to "remove the Vendor from the program at its discretion."  BB ¶ 9.  The NYPD may also suspend the Program at the discretion of the Police Commissioner, First Deputy Commissioner, or Chief of Personnel.  BB ¶ 10.

### A. Officer Participation in the PDP

The NYPD is solely responsible for setting the eligibility requirements for Officers to par-ticipate in the PDP[2], and it does so without input or comments from Bloomberg or any other par-ticipating vendor.  BB ¶ 11.  To enroll in the PDP, the NYPD requires an Officer to submit an application[3], signed by the Officer's NYPD commanding officer, as well as a signed W-9 form, to the NYPD.  BB ¶ 13.  The NYPD is exclusively responsible for reviewing Officers' applications to enroll in the PDP and has sole discretion and authority in determining whether to approve or deny an Officer's application.  BB ¶ 15.

To enroll in the PDP, an Officer must be on full duty status and may not be on chronic sick category "B" or on levels two or three performance monitoring.  BB ¶ 16.  Probationary police officers must have at least one full year of service before they may enroll in the PDP.  BB ¶ 17.  The NYPD maintains authority to unilaterally remove an Officer from the PDP if they are pro-moted or transferred to a position that disqualifies them or placed on performance monitoring.

---

[2]    NYPD personnel who hold any of the following titles may participate in the PDP, subject to eligibility requirements set by the NYPD: Police Officer, Detective, Sergeant, or Lieutenant.  BB ¶ 12.

[3]    The application, titled "Paid Detail Enrollment Application and Participation Agreement," was created by the NYPD.  BB ¶ 14.

BB ¶ 18.  Only the NYPD, not Bloomberg or any other vendor, can suspend or remove Officers from participating in the PDP.  BB ¶ 19.

At all relevant times, the NYPD has maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs.  BB ¶ 20.  Bloomberg does not have the authority to hire or fire any Officer.  BB ¶ 21.  In addition, Officers did not submit any applications to participate in the PDP to Bloomberg.  BB ¶ 22.  Bloomberg did not recruit Officers to participate in the PDP.  BB ¶ 23. Bloomberg also did not interview Officers before they selected and worked paid details at Bloomberg.[4]  BB ¶ 24.  The only contractual engagement for the provision of paid detail services by NYPD Officers is between Bloomberg and the NYPD; Officers do not have any contract with Bloomberg or GardaWorld to perform paid details.  BB ¶ 25.  Officers do not consider themselves freelancers while working paid details.  BB ¶ 26.

## B.    Bloomberg's Participation in the PDP

Bloomberg is a global financial, software, data, and media company.  BB ¶ 27.  Bloomberg provides a wide range of products and services to individuals, businesses, and institutions, including financial software tools, enterprise applications and order management systems for the institutional marketplace, as well as news to financial companies and organizations, a global television network, website, radio stations and magazines.  BB ¶ 28.  Bloomberg has three main office locations in New York City: 731 Lexington Avenue, 919 Third Avenue, and 120 Park Avenue. BB ¶ 29.

Bloomberg is not a security company and it is not in the business of providing security services to customers or members of the public.  BB ¶ 30.  Instead, Bloomberg has had long-

---

[4]    GardaWorld has no role in ensuring that Officers are appropriately licensed or certified. GW ¶ 51.

standing relationships with third-party vendors to provide security services globally, including in and around its premises in New York City.[5]  BB ¶ 31.  Since May 2022, GardaWorld has provided security services for Bloomberg's New York City campus.[6]  BB ¶ 33; GW ¶¶ 3, 4.  In or around January 2016, Bloomberg began participating in the PDP to enhance security coverage at its premises with the presence of uniformed officers at highly visible posts, to reduce NYPD response time in the event of an emergency, and to provide a greater level of comfort to employees regarding the safety of their workplace.  BB ¶ 35.  Prior to participating in the PDP, Bloomberg submitted a Certificate of Insurance to the NYPD and signed a Paid Detail Agreement.  BB ¶ 36.

Initially, Bloomberg used the PDP at only its Lexington Avenue location.  BB ¶ 37. Bloomberg expanded its use of the PDP to its Park Avenue and Third Avenue locations in or around the last quarter of 2018.  BB ¶ 38.  Bloomberg's Security Operations Department is responsible for overseeing the PDP at Bloomberg, as well as Bloomberg's relationship with the NYPD in connection with the PDP.  BB ¶ 39.

Officers who elect to work paid details at Bloomberg do not perform a discrete job integral to Bloomberg's business.  BB ¶ 40.  Rather, the services Officers perform on paid detail are separate and distinct from the services and products Bloomberg offers.  BB ¶ 41.  Officers performing paid details also require specialized skills that Officers obtain exclusively through NYPD training. BB ¶ 42.  In addition, Officers performing paid details wear their full NYPD uniform and carry their NYPD-issued equipment, including their NYPD-issued firearm, gun belt, and radio. BB ¶ 43.  The highly visible presence of a uniformed NYPD Officer serves as a visual deterrent

---

[5]  Bloomberg does not engage guarding or security services at all of its locations.  In some locations, Bloomberg may rely upon guarding services provided by the buildings in which it may be a tenant.  BB ¶ 32.

[6]  Prior to May 2022, Bloomberg had a relationship with Silverseal Corporation to provide security services in and around its premises.  BB ¶ 34.

to potential bad actors who may otherwise engage in criminal or violent activity on Bloomberg's premises or attempt to harm Bloomberg's personnel or facilities. BB ¶ 44. Officers on paid details also provide the exclusive service of being able to use the NYPD-issued radio to reduce NYPD response time and facilitate rapid response by emergency personnel in the event of an emergency. BB ¶ 45. These are services that neither Bloomberg Security Operations personnel nor Garda-World personnel can provide. BB ¶ 46. Specifically, Bloomberg's Security Operations personnel and GardaWorld employees at Bloomberg's New York City locations do not have the power to do what Officers are authorized to do as law enforcement officers, such as to stop, question, and possibly frisk suspicious individuals; effectuate arrests; or directly communicate via radio with the local NYPD precinct to facilitate rapid response by law enforcement or emergency personnel. BB ¶ 47.

## C.    GardaWorld's Non-Participation in the PDP

GardaWorld provides a wide range of security services, including security guard services, to customers in a wide range of industries; Bloomberg is one such client. GW ¶ 1. GardaWorld does not participate in the PDP and it is not a party to any Paid Detail agreement with New York City or the NYPD. GW ¶¶ 6, 7. The services GardaWorld provides to Bloomberg are in addition to, and separate from, the services Bloomberg procures through the PDP. GW ¶ 5. GardaWorld employs a team of security guards who are assigned to the three Bloomberg New York City locations, as well as on-site supervisors who are responsible for overseeing the GardaWorld security guards assigned to Bloomberg. GW ¶¶ 8, 10, 11. All personnel that GardaWorld provides at Bloomberg's New York locations are GardaWorld employees. GW ¶ 12. Bloomberg's Security Operations department directs the functions of GardaWorld employees working at its New York locations. GW ¶¶ 14, 16-19.

6

## II.   NYPD CONTROL OVER OFFICERS PROVIDING PAID DETAIL SERVICES

### A.   The NYPD Controls the Scheduling of Paid Details.

The NYPD controls when Bloomberg may schedule Officers for details and requires that details last from four to twelve hours.  BB ¶ 48.  Under the Paid Detail Agreement, Bloomberg has agreed "not to contact officers directly to fill or augment a paid detail assignment," and is "prohibited from formulating details or scheduling assignments except through the Paid Detail [U]nit." BB ¶ 49.  Therefore, Bloomberg does not communicate with any Officers about scheduling paid detail shifts.  BB ¶ 50.  Instead, Bloomberg's Security Operations Department decides the days of the week and the hours it wants to have uniformed Officers provide paid details, and then communicates to the NYPD Paid Detail Unit—the exclusive point of contact for matters related to the PDP—the days, times, and locations for which Bloomberg requests the presence of an Officer. BB ¶ 51.  The NYPD determines the minimum amount of coverage necessary for each detail, along with supervisory coverage, based on safety and security considerations for each detail.  BB ¶ 52.

The NYPD controls and determines when Officers may accept paid details and the number of hours per month Officers may work paid details.  BB ¶ 53.  Specifically, the NYPD limits Police Officers and Detectives to a maximum of 80 hours per month, and limits Sergeants and Lieutenants to a maximum of 30 hours per month, of paid detail shifts.  BB ¶ 54.  NYPD policy is that Officers are not permitted to work any paid detail assignment within three hours of the start of their regularly scheduled tour or within one hour of the conclusion of their regular tour.  BB ¶ 55.

The NYPD does not require Officers to participate in the PDP.  BB ¶ 56.  Instead, Officers are free to choose which, if any, details they wish to work at Bloomberg or any other vendor. BB ¶ 57.  Eligible Officers may access the NYPD's Paid Detail Intranet Assignment System—a system created, maintained, and operated solely by the NYPD and accessible only by NYPD

7

and/or City employees—to view available paid details or schedule themselves for details. BB ¶ 58. Bloomberg has no access to the system. BB ¶ 59. Officers must use the Intranet Assignment System to schedule paid detail shifts, and they regularly do so. BB ¶ 60. The NYPD prohibits Officers from working for participating businesses, including Bloomberg, outside of the PDP. BB ¶ 61. Officers who schedule details directly with a participating business are disciplined and deemed ineligible for future PDP assignments. BB ¶ 62.

Officers who participate in the PDP may work paid details for any NYPD-approved company, entity, or vendor, not just Bloomberg, if they choose to do so. BB ¶ 63. Officers did, in fact, work paid details for other vendors. BB ¶ 64. Bloomberg does not control which Officers participate in the PDP, which Officers choose to work paid detail shifts at Bloomberg, or how frequently any Officer works paid detail shifts at Bloomberg. BB ¶ 65. Bloomberg also cannot choose which specific Officers sign up to perform paid details at their locations through the PDP portal. BB ¶ 66. Thus, Bloomberg has no control over whether or when an Officer will show up for a requested paid detail, and there is no guarantee that an Officer will sign up for a particular detail at Bloomberg. BB ¶ 67. While the NYPD makes a good faith effort to supply an Officer to a paid detail, it makes no representations or guarantees that an Officer will in fact appear at a paid detail. BB ¶ 68. The NYPD does not in any way discipline Officers eligible to participate in the PDP for declining to sign up for a particular paid detail assignment, or for declining to sign up for any paid details at all. BB ¶ 69. Indeed, there may be situations beyond the control of the Paid Detail Unit where an Officer is unable to appear at a paid detail.[7] BB ¶ 70. In such situations, Bloomberg is left with no Officer coverage. BB ¶ 71.

---

[7]    For example, in November and December 2021, an average of eight to ten paid details requested by Bloomberg each month were not filled, either because no officer signed up to work

Officers must use the Paid Detail Intranet Assignment System to cancel a previously selected detail, provided the date of the detail is at least 24 hours in the future; if the detail is less than 24 hours away, the Officer must call the Paid Detail Unit to cancel.  BB ¶ 74.  An Officer's failure to timely notify the Paid Detail Unit of a cancelled paid detail shift without good cause may lead to the NYPD suspending or removing that Officer from the PDP.  BB ¶ 75.  Similarly, an Officer's failure to appear at a paid detail without cause may lead the NYPD to suspend or remove that Officer from the PDP.  BB ¶ 76.  The NYPD has the sole discretion and authority to determine whether to suspend or remove an Officer from the PDP for not showing up to a paid detail for which they signed up.[8]  BB ¶ 77.

GardaWorld has no role in, knowledge of, or responsibility for: making paid detail shifts at Bloomberg available to Officers; requesting, posting, or scheduling paid detail shifts at Bloomberg; or assigning paid detail shifts to Officers.  GW ¶¶ 23-27.  GardaWorld employees have no control over whether Officers sign up for paid details at Bloomberg or show up for paid detail shifts for which they have signed up.  GW ¶¶ 28, 29.  GardaWorld also has no control over whether Officers sign up for paid detail shifts at all, which shifts Officers may choose to take on, or with what vendor.  GW ¶ 30.

**B.    The NYPD Is Solely Responsible for Training Officers and Supervising Officers on Paid Details.**

Any Officer assigned by the Paid Detail Unit to work a detail is an active armed, full-duty New York City Police Officer who has been trained by the NYPD.  BB ¶ 80.  Neither Bloomberg

---

the paid detail or the NYPD assigned its officers to tours and details elsewhere.  BB ¶ 72.  On each occasion a paid detail was not filled, there simply was no uniformed officer present.  BB ¶ 73.

[8]    NYPD policy is that no PDP personnel or assignment substitutions are permitted without specific permission of a Paid Detail supervisor.  BB ¶ 78.  In fact, the NYPD suspends Officers who request paid details on behalf of other Officers or perform paid details originally assigned to another Officer without the NYPD's prior authorization.  BB ¶ 79.

Security Operations nor GardaWorld personnel provide any training to Officers concerning the performance of their responsibilities while working paid details. BB ¶ 81; GW ¶¶ 40-43. While performing paid details, all Officers carry with them full law enforcement powers and are expected to perform police related duties only. BB ¶ 82. Should an arrest become necessary during a paid detail, the Officer must notify an on-duty NYPD supervisor and any processing of that arrest by the Officer is performed on police (NYPD) overtime. BB ¶ 83.

The NYPD maintains direction, control, and supervision of the work Officers perform during paid details. BB ¶ 84. Officers who participate in the PDP are subject at all times to NYPD rules, regulations, and standards of conduct and must follow all NYPD rules and procedures, including the NYPD Patrol Guide, while performing a paid detail. BB ¶ 85. Bloomberg does not determine or create the NYPD's rules and procedures. BB ¶ 86. The NYPD requires Officers to treat members of the public with courtesy and respect while performing a paid detail and informs Officers that while they are performing paid details, they remain at all times "highly visible representatives" of the NYPD. BB ¶ 87. NYPD informs Officers that failure to follow any NYPD or Paid Detail Unit rules or regulations may be banned from returning to a specific vendor, suspended from eligibility, or dropped from the program. BB ¶ 88.

Upon arrival at a participating business, the NYPD commands Officers to report to the business's representative or to the ranking Officer supervising the detail. BB ¶ 89. Upon an Officer's arrival for a paid detail at Bloomberg, a member of Bloomberg Security Operations or a GardaWorld employee relays to the Officer basic information concerning Bloomberg's security coverage needs, including an overview of the building layout, ingress and egress points, high visibility areas, and any circumstances requiring particular attention and heightened security coverage. BB ¶ 90. Information regarding high visibility posts, communication with other security

10

personnel, and building access for Officers' personal needs and basic instructions for Officers performing paid details are summarized in an Instruction Sheet maintained at the front security desk in the lobby of each Bloomberg location. BB ¶ 91. GardaWorld does not create the Instruction Sheet. GW ¶¶ 34, 35. Officers are not required to take the Instruction Sheet; it is available if Officers request it. GW ¶ 36. Bloomberg does not provide Officers with any policies and does not expect Officers to enforce Bloomberg's policies. BB ¶ 92.

At the start of each paid detail shift, Bloomberg provides the Officer with a Bloomberg radio by which the Officer may communicate with Bloomberg Security Operations and other security personnel if the need arises. BB ¶ 93. The purpose of providing the radio is to ensure that Officers have situational awareness of what is going on in the building at any given time. BB ¶ 94. Officers return the radio to Bloomberg at the conclusion of the paid detail shift. BB ¶ 95. Other than the radio, Bloomberg does not provide Officers with any equipment. BB ¶ 96. GardaWorld does not provide radios or any other equipment to Officers. GW ¶38.

Bloomberg's Security Operations Department decides how to utilize Officers on paid details in the way that best meets Bloomberg's security needs. BB ¶ 97; GW ¶ 22. The primary function of Officers on paid details at Bloomberg is to provide a uniformed NYPD security presence. BB ¶ 98. Bloomberg identifies the high visibility posts that paid detail Officers are expected to patrol, but it expects Officers to use their training to respond to and address security issues. BB ¶ 99. Although Bloomberg does not dictate when an Officer may take a rest break or leave his or her post for personal necessity, in order to ensure full security coverage at all times, Bloomberg advises Officers of the times at which they may take an extended break, which times are coordinated with the schedules of other security personnel to ensure that there is no gap or lapse in security at any time. BB ¶ 100.

The NYPD has the sole authority to assign, and has assigned, NYPD supervisors to inspect Officers during Officers' performance of paid details. BB ¶ 101. The NYPD is not required to inform Bloomberg in advance when an NYPD supervisor will inspect an Officer during the Officer's performance of a paid detail. BB ¶ 102. Bloomberg may not prohibit any NYPD supervisor from inspecting Officers' performance of paid details. BB ¶ 103. The NYPD did not provide Bloomberg any official written reports on any NYPD supervisor's inspection of Officers' performance of paid details. BB ¶ 104.

By contrast, Bloomberg's Security Operations personnel do not supervise Officers performing paid details at Bloomberg locations. BB ¶ 105. Bloomberg does not require or receive reports of any kind from the Officers. BB ¶ 106. Bloomberg does not evaluate or provide performance reviews for Officers working paid details at its premises. BB ¶ 107. Similarly, Bloomberg did not assign or expect GardaWorld to observe or monitor where the Officer performing paid detail is assigned at any particular time. BB ¶ 108. GardaWorld does not supervise Officers performing paid details at Bloomberg. GW ¶¶ 39-42. As GardaWorld's corporate representative testified: "It's not GardaWorld policy to be instructing a paid detail." GW ¶ 42. GardaWorld has no oversight over the NYPD of their paid detail, and it has no grounds to instruct Officers on how to perform their duties. GW ¶ 41.

Before becoming employed with Bloomberg in its Security Operations department, William Church worked for the NYPD for approximately 28 years. BB ¶ 109. As an NYPD Lieutenant, Mr. Church was responsible for supervising Officers, including conducting a formal rollcall (also known as "turning them out"), inspecting their uniforms, training, ensuring Officer adherence to all of the rules and guidelines of the NYPD patrol guide, disciplining Officers when appropriate, and correcting their behavior. BB ¶ 110. In addition, Mr. Church reviewed paid detail cards

12

completed by Officers who reported to him to ensure that the Officers complied with the NYPD's rules regarding the permitted number of hours and timing of paid details relative to each Officer's regularly scheduled NYPD tours.  BB ¶ 111.  In his time at Bloomberg, neither Mr. Church nor any GardaWorld employee has performed any supervisory duties with respect to any Officer performing a paid detail at Bloomberg.  BB ¶ 112.

**C.    The NYPD Controls Officers' Physical Appearance and Equipment During Paid Details.**

The NYPD maintains control and direction over the uniforms and physical appearance of Officers on paid details.  BB ¶ 113.  Specifically, the NYPD requires that Officers wear a full NYPD uniform and conform to all NYPD grooming and appearance standards applicable to on-duty members in uniform when performing paid details.  BB ¶ 114.  Officers are subject to inspection by an NYPD supervisor for their grooming and appearance while performing paid details.  BB ¶ 115.  The NYPD also requires all Officers performing paid details to bring an NYPD radio tuned to the proper frequency, as well as NYPD-issued batons and activity logs.  BB ¶ 116.  All equipment on an Officer's gun belt—e.g., firearm, baton, mace, handcuffs—is NYPD-issued, and Bloomberg provides no instructions on how to use these items.  BB ¶ 117.  If an active shooter, workplace violence incident, illness, or injury were to arise on-site, the Officer on paid detail would use their NYPD radio (not the Bloomberg radio) to communicate with the local police station or to expedite an ambulance to the location.[9]  BB ¶ 118.  Bloomberg does not inspect an Officer's uniform or review their activity log.  BB ¶ 119.  By contrast, NYPD supervisors come onto Bloomberg premises to monitor and inspect Officers posted at Bloomberg's locations.  BB ¶ 120.

---

[9]    GardaWorld employees do not have the authority to direct Officers to make arrests or to discharge their weapons.  GW ¶¶ 55, 56.

13

### D.    Only the NYPD May Discipline or Suspend Officers.

The NYPD can discipline an Officer who violates NYPD rules and procedures while performing a paid detail.  BB ¶ 121.  The power to discipline Officers, including those performing paid details, rests solely with the NYPD Commissioner.  BB ¶ 123.  Bloomberg does not have the authority to discipline any Officer, even if they engage in conduct that is inconsistent with Bloomberg's expectations of a security contractor.  BB ¶ 124.  GardaWorld also does not reprimand or discipline Officers.  GW ¶¶ 44, 45.

If a member of Bloomberg's Security Operations team were to observe an Officer not exercising a high level of vigilance and monitoring the premises as expected, they would simply remind the Officer of Bloomberg's expectation that the Officer should remain vigilant.  BB ¶ 124.  On the rare occasion a member of Bloomberg's security team has observed a paid detail Officer not in an area that they were expected to patrol, the security team member simply reminded the Officer where they were expected to patrol (i.e., the high visibility posts).[10]  BB ¶ 125.  If an Officer is observed not performing in the manner expected despite being reminded of Bloomberg's expectations, Bloomberg's only other recourse is to contact the Paid Detail Unit to report the issue (i.e., that the Officer "was not performing and providing the service they were contracted to do") and request that they not be assigned to future paid details at Bloomberg.  BB ¶ 126.  A request by Bloomberg that an Officer not be permitted to return to its premises impacts only that Officer's ability to work paid details at Bloomberg; it does not impact that Officer's eligibility to work paid details for other vendors.  BB ¶ 127.  In any event, this has not happened frequently, and in fact, such escalations to the Paid Detail Unit are rare.  BB ¶ 128.  Whether an Officer is subject to any

---

[10]    GardaWorld has no role in reporting any dissatisfaction with Officers' performance of paid details to the NYPD.  GW ¶¶ 46, 52.  GardaWorld has not requested that an Officer no longer be assigned to paid detail shifts at Bloomberg.  GW ¶ 47.

14

discipline resulting from Bloomberg's report of an issue is entirely up to the NYPD; Bloomberg has neither input nor insight into that decision.  BB ¶ 129.

GardaWorld employees do not have the authority to evaluate Officers' performance, promote Officers, discipline Officers, or terminate an Officer's employment.  GW ¶¶ 52-54, 57.  Further, GardaWorld does not record, investigate, or address Officer complaints, concerns, or inquiries by Officers regarding paid detail shifts at Bloomberg.  GW ¶ 48-50.

### E.    The NYPD Sets the Form and Manner of Payment to Officers for Paid Details.

The NYPD directs and controls the amount, form, and manner of payment to the NYPD and its Officers through the PDP for paid details.  BB ¶ 130.  These terms are dictated by the Paid Detail Agreement between Bloomberg and the NYPD.  BB ¶ 131.  The hourly rates for paid details were established by the NYPD, not Bloomberg.  BB ¶ 132.  These rates are subject to change by the NYPD, with no input by Bloomberg.  BB ¶ 133.  The NYPD also charges Bloomberg an administrative fee of 10% for each hour of PDP work performed by an Officer.  BB ¶ 134.

The NYPD prohibits Bloomberg from using any form of payment for Officers other than hard copy checks.  BB ¶ 135.  Pursuant to the non-negotiable terms of the Paid Detail Agreement, Bloomberg must deliver hard copy checks for Officers to the NYPD's Paid Detail Unit for distribution by the NYPD's Paid Detail Unit to Officers.  BB ¶ 136.  The NYPD does not permit Bloomberg to give a check directly to any Officer for working a paid detail.  BB ¶ 137.  After Bloomberg sends the checks to the Paid Detail Unit, Bloomberg has no control over when or how the NYPD distributes checks to the Officers.  BB ¶ 138.

Bloomberg does not pay Officers through its payroll as it does its own employees.  BB ¶ 139.  Rather, Bloomberg's accounts payable department is responsible for processing payments to Officers who work paid detail shifts at Bloomberg.  BB ¶ 140.  Each Officer is set up in

15

Bloomberg's finance system as a separate "vendor." BB ¶ 141. The payments to Officers for paid detail services are treated as non-wage income from which Bloomberg does not withhold or deduct any employment-related taxes and for which Bloomberg must issue 1099 forms to the Officers "by name, in care of the Paid Detail Unit," as directed by the NYPD. BB ¶ 142. The Paid Detail Unit, not Bloomberg, is responsible for forwarding the 1099 forms to individual Officers. BB ¶ 143. The NYPD instructs Officers participating in the PDP to list the NYPD's One Police Plaza address (rather than the Officer's home address) on any W-9 forms submitted to vendors for paid details performed. BB ¶ 144. Pursuant to the Paid Detail Agreement, Bloomberg must agree to accept, in lieu of a W-9, officer information contained on the Paid Detail Card for Taxpayer Identification Number (TIN) reporting purposes. BB ¶ 145.

The NYPD prohibits Officers from contacting Bloomberg directly regarding any issues related to the Officers' payment for a paid detail. BB ¶ 146. Similarly, Bloomberg does not contact Officers directly about any issues relating to paid details, including pay issues. BB ¶ 147. The NYPD instructs Officers that if they have not received a check after eight weeks of a paid detail shift, they should call the Paid Detail Unit and should not contact the vendor directly. BB ¶ 148.

GardaWorld does not pay Officers. GW ¶ 65. It has no role in ensuring that Officers are paid for their paid detail shifts at Bloomberg, and it does not record, investigate, or address Officer complaints regarding their pay for paid details. GW ¶ 66-69.

F.    **Neither Bloomberg Nor GardaWorld Maintain Employment Records for Officers.**

The NYPD created a "Paid Detail Attendance Sheet" and provided it to Bloomberg for use in connection with the Paid Detail Program at each of its locations. BB ¶ 149. The NYPD requires that Officers sign in on a Paid Detail Attendance Sheet at the start, and sign out at the conclusion, of a paid detail. BB ¶ 150. The terms of the Paid Detail Agreement require Bloomberg to maintain

16

the Attendance Sheet on premises for Officers to record their names, signatures, and dates and times of paid detail service. BB ¶ 151; GW ¶ 31. Bloomberg must maintain the Attendance Sheet for at least one year and must make it available for inspection upon request by any properly identified ranking member of the NYPD. BB ¶ 152. Bloomberg does not check the NYPD attendance log to confirm the Officer properly signed in. BB ¶ 153. By contrast, NYPD supervisors come onto Bloomberg premises and review the attendance log from time to time. BB ¶ 154.

The NYPD requires Officers to complete a Paid Detail Card[11] for each paid detail they perform and to have their designated NYPD command supervisor sign a copy of the triplicate Paid Detail Card and leave a copy with their NYPD command. BB ¶ 155. Pursuant to the Paid Detail Agreement, Bloomberg must also designate authorized personnel to sign the Paid Detail Card at the end of each paid detail shift. BB ¶ 157.

Bloomberg does not direct Officers how to complete the Paid Detail Card or review it to ensure it is completed properly. BB ¶ 158. Most of the information listed on the Paid Detail Card is not relevant to Bloomberg, such as the date and time of the Officer's last and next regular tours. BB ¶ 159. The blue copy of the Paid Detail Card serves as an invoice for paid detail services provided as well as the associated administrative fee; Bloomberg uses it solely for purposes of later verifying the number of hours for which Bloomberg is billed by the NYPD and for issuing payment to Officers. BB ¶¶ 160, 161.

Officers do not provide Bloomberg any employment application, résumé, or emergency contact information. BB ¶ 162. Officers do not have access to Bloomberg's email system or receive a Bloomberg email address. BB ¶ 163. Officers do not receive any employee benefits from

---

[11] The NYPD created the form entitled "Paid Detail Card PD 407-168 (Rev. 03-17)." BB ¶ 156.

17

Bloomberg; rather, any employee benefits are provided to Officers solely by the NYPD.  BB ¶ 164.

Similarly, GardaWorld does not create, maintain, or compile any documents in connection with

the PDP, including W-9 tax forms, attendance records, radio logs, Paid Detail Cards or other doc-

uments used by Officers performing paid detail shifts at Bloomberg.[12]  GW ¶¶ 58-61, 70.

## III.    PLAINTIFF BURBRAN PIERRE AND OPT-IN PLAINTIFFS

Named Plaintiff Burbran Pierre worked a single paid detail at Bloomberg's Park Avenue

location on September 25, 2019.  BB ¶ 165.  On September 27, 2022, the Court granted Plaintiffs'

motion for conditional certification of the FLSA collective, defined as "all similarly situated

NYPD Police Officers, Detectives, Sergeants, and Lieutenants (collectively 'Officers') who per-

formed work through the Paid Detail Program for any of the Vendor Defendants at any time from

July 3, 2017 to the present" (Dkt. 184 at 21) and authorized notice to issue to the certified collec-

tive.  To date, 1,363 individuals have submitted a consent to join the FLSA collective.[13]  BB ¶ 166.

## IV.    PROCEDURAL HISTORY

Named Plaintiff initiated this action on July 3, 2020, asserting claims under the FLSA,

NYLL, and FIFA against Bloomberg, the NYPD, the City of New York (the "City"), and other

vendor entities[14] based on their alleged failure to timely compensate Officers for work they

---

[12]    At the direction of Bloomberg's Security Operations team, GardaWorld employees have performed ministerial tasks and collected documents from Officers relating to their paid detail shifts and transmitted those documents to Bloomberg, such as signing Officers' completed Paid Detail Cards.  GW ¶¶ 62-64.

[13]    The Court struck the consent to join forms filed by four other individuals who attempted to join the action as opt-in plaintiffs.  Dkt. 362 (Clarise Luces, Arafat Cooper, Joseph Cortes); Dkt. 367 (Gerard Beyrodt).

[14]    The other defendants included Trihop 14th Street LLC, Whole Foods Market Group, Inc., Duane Reade, Inc., TD Bank N.A., and B&H Foto Electronics Corp.  *See* Dkt. 1.  Trihop never appeared or responded to the Complaint and the Clerk entered a Certificate of Default against Trihop on September 23, 2020.  Dkt. 47.  All of the other originally named defendants reached settlements and were dismissed from the case at various points of the litigation.  *See* Dkt. 252

performed as part of the PDP. Dkt. 1. Bloomberg filed its Answer denying all material allegations on September 14, 2021. Dkt. 83. Bloomberg, the City, the NYPD, Plaintiffs, and the other vendor defendants then in the case engaged in extensive discovery for nearly four years, resulting in a voluminous evidentiary record amassed from multiple rounds of written discovery requests and responses, production of nearly 14,000 pages of documents and ESI by Bloomberg and hundreds of pages of documents by Plaintiffs, the City, and NYPD, and approximately 5,500 pages of deposition testimony. Kosovych Decl. ¶ 2. In addition to deposing Named Plaintiff Pierre, Bloomberg deposed 17 opt-in plaintiffs. Kosovych Decl. ¶ 3. Plaintiffs deposed William Church, Bloomberg's Team Lead, Americas of Security Operations, and designated corporate witness; Patrick Kerins, Ryan Sullivan and Fenton Reese, Bloomberg's Security Operations Territory Managers; and Margarita Martinez and Natalie Estrella from Bloomberg's Accounts Payable department. Kosovych Decl. 4. Discovery as to Bloomberg closed on September 13, 2024. Dkt. 469, 483.

On March 7, 2024, the Court granted Plaintiffs' motion for leave to file an Amended Complaint introducing GardaWorld as a new defendant.[15] Dkt. 434. Plaintiffs filed the Amended Complaint on July 9, 2024. Dkt. 458. Bloomberg filed its answer to the Amended Complaint on July 23, 2024. Dkt. 467. GardaWorld answered on September 9, 2024. Dkt. 477. Plaintiffs and GardaWorld thereafter engaged in discovery, which included the exchange of written discovery, production of documents, and deposition testimony. Mingione Decl. ¶ 4. On September 15, 2025, the parties agreed that all discovery was complete and so advised the Court. Dkt. 554.

---

(Whole Foods); Dkt. 499 (TD Bank); Dkt. 516 (B&H, City, NYPD); Dkt. 584 (Duane Reade, City, NYPD); Dkt. 607 (City and NYPD).

[15] The Court also granted leave for Plaintiffs to add Bloomberg's former security contractor, Silverseal Corporation, as a defendant. Dkt. 434. Silverseal reached a settlement and has been dismissed from the case. Dkt. 604.

**LEGAL STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "If the moving party discharges its burden of proof under Rule 56(c), the non-moving party must then 'set forth specific facts showing that there is a genuine issue for trial.'" *Meyer v. U.S. Tennis Ass'n*, No. 1:11-cv-06268 (ALC)(MHD), 2014 WL 4495185, at *5 (S.D.N.Y. Sept. 11, 2014), *aff'd*, 607 F. App'x 121 (2d Cir. 2015) (quoting Fed. R. Civ. P. 56(e)). "'[T]he mere existence of some alleged factual dispute between the parties' alone will not defeat a properly supported motion for summary judgment, and '[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). Enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. *Id.* When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and the court should grant summary judgment. *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir.1999).

**ARGUMENT**

I.  **OPT-IN PLAINTIFFS WHO NEVER WORKED A PAID DETAIL AT BLOOMBERG HAVE NO VIABLE CLAIMS AGAINST BLOOMBERG OR GARDAWORLD, AND OPT-IN PLAINTIFFS WHO WORKED PAID DETAILS AT BLOOMBERG BEFORE MAY 20, 2022, HAVE NO CLAIMS AGAINST GARDAWORLD.**

"[L]iability in the context of the FLSA is predicated on the existence of an employer-employee relationship." *Cavallaro v. UMass Mem'l Health Care, Inc.*, 971 F. Supp. 2d 139, 146 (D. Mass. 2013). Defendants also "cannot be liable to plaintiffs who did not work for them." *Crumbling v. Miyabi Murrells Inlet, LLC*, 192 F. Supp. 3d 640, 646 (D.S.C. 2016); *see Bojaj v. Moro Food Corp.*, No. 13 Civ. 9202, 2014 WL 6055771, at *4 (S.D.N.Y. Nov. 13, 2014) ("Only

20

employees may sue under the FLSA and NYLL. . . .   Therefore, if plaintiffs do not allege that [defendant] employed them, they lack standing to maintain a claim against [defendant]").  By the same token, FIFA's protections extend only to "freelance workers," defined as "any natural person or any organization composed of no more than one natural person, . . . that is hired or retained as an independent contractor by a hiring party *to provide services in exchange for compensation*." N.Y.C. Admin. Code § 20-927 (emphasis added).

Only 316 of the 1,363 opt-in plaintiffs who have submitted consents to join this action ever worked a paid detail at Bloomberg.  BB ¶ 167.  According to NYPD records, the remaining 1,047 opt-in plaintiffs never worked a single paid detail at Bloomberg.  BB ¶ 167.  Three opt-in plaintiffs (Earls, Rivera, and Loomis) admitted during their depositions that they never worked any paid details at Bloomberg.  BB ¶ 168.  Bloomberg has no record of Kyna Phillip or Joseph Rosario working any paid details at any of its locations in New York City.  BB ¶ 169.  Plaintiffs confirmed that six other opt-in plaintiffs either did not perform any details at Bloomberg or else did so outside of the FLSA statutory limitations period.  BB ¶¶ 170, 171.  Opt-in plaintiffs who never worked a paid detail at Bloomberg lack standing to assert any FLSA, NYLL, or FIFA claims against Bloomberg and GardaWorld, and the Court should grant summary judgment in Bloomberg's and GardaWorld's favor as to those individuals' claims.[16]

## II.   THE UNDISPUTED FACTS DEMONSTRATE THAT BLOOMBERG AND GARDAWORLD DID NOT EMPLOY PLAINTIFFS.

Only an "employer" can be liable for violations of the FLSA and NYLL.  *See* 29 U.S.C. § 207(a)(1); N.Y. Lab. L. § 195; 12 N.Y.C.R.R. § 142-2.2.  Plaintiffs' FLSA and NYLL claims

---

[16]  GardaWorld did not become Bloomberg's security contractor until May 20, 2022. BB ¶ 33.  Accordingly, any opt-in plaintiffs who worked paid details at Bloomberg only prior to May 20, 2022, cannot assert claims against GardaWorld.

fail as a matter of law because at all relevant times, they were employed only by the NYPD, not by Bloomberg or GardaWorld. *See Gitter v. Target Corp.*, No. 14cv4460 (DLC), 2015 WL 5710454, at *5 (S.D.N.Y. Sept. 29, 2015) (concluding that the Paid Detail Program did not create employment relationship between police officer and private entity); *Arce v. Sovereign Indus. Grp. Inc.*, No. 19-CV-489(NGG)(JRC), 2025 WL 102449, at *5 (E.D.N.Y. Jan. 15, 2025).

## A. The Economic Realities Test Determines Joint Employer Status.

The FLSA and NYLL define employment almost identically. *Compare* 29 U.S.C. § 203(g) ("'Employ' includes to suffer or permit to work.") *with* N.Y. Lab. L. § 2(7) ("'Employed' includes permitted or suffered to work."). Consequently, "district courts in this Circuit have consistently interpreted the definition of 'employer' under the [NYLL] coextensively with the definition used by the FLSA." *Arce*, 2025 WL 102449, at *5 (citation omitted).

The Second Circuit has directed that "the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts,' determined by reference not to 'isolated factors, but rather upon the circumstances of the whole activity.'" *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (citation omitted).[17] While the purpose of the economic reality test is "to expose outsourcing relationships that lack a substantial economic purpose," *Jean-Louis v. Metro. Cable Comms., Inc.*, 838 F. Supp. 2d 111, 121 (S.D.N.Y. 2011), "it is manifestly not intended to bring

---

[17] Courts in the Second Circuit "hold that the [NYLL] embodies the same standards for joint employment as the FLSA." *Paz v. Piedra*, No. 09 Civ. 03977 (LAK) (GWG), 2012 WL 12518495, at *5 (S.D.N.Y. Jan. 12, 2012) (quoting *Chen v. St. Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 278 (E.D.N.Y. 2005)); *see also Ocampo v. 455 Hosp. LLC*, No. 14-CV-9614 (KMK), 2016 WL 4926204, at *5 n.7 (S.D.N.Y. Sept. 15, 2016) ("Courts regularly apply the same tests to determine whether entities are joint employers for purposes of the FLSA and NYLL.").

normal, strategically-oriented contracting schemes within the ambit of the FLSA." *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 76 (2d Cir. 2003).

The Second Circuit focuses on control to assess whether a business is a joint employer of another employer's worker. *See Greenawalt v. AT&T Mobility LLC*, 642 F. App'x 36, 37 (2d Cir. 2016) (citing *Barfield*, 537 F.3d at 142-43). The *Carter* test examines "the degree of formal control exercised over a worker." *Barfield*, 537 F.3d at 143. It asks "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled the employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984). *See also Sampson v. MediSys Health Network, Inc.*, No. 10-CV-1342 (SJF) (ARL), 2012 WL 3027838, at \*4 (E.D.N.Y. July 24, 2012) (dismissing FLSA claims where "[t]here [were] no facts that indicate that [the defendant] had any direct role in hiring or firing the plaintiffs or that it supervised or controlled their work schedules" or to "indicate that [the defendant] had any direct role in controlling the plaintiffs' conditions of employment or in determining their rate and method of payment").

In the absence of formal control, a defendant may qualify as an "employer" under the FLSA if it "exercised functional control over a worker." *Barfield*, 537 F.3d at 143. The following factors inform this determination:

> (1) whether [the purported joint employer's] premises and equipment were used for the plaintiffs' work; (2) whether the [direct employer] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the purported joint employer's] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [purported joint employer] or [its] agents supervised plaintiffs' work; and (6) whether plaintiff worked exclusively or predominantly for the [purported joint employer].

23

*Zheng*, 355 F.3d at 72.  Under the Second Circuit's guidance, the *Zheng* test is the "most relevant in the context of subcontractor relationships."  *Arce*, 2025 WL 102449, at \*5 (citations omitted).  "But 'the court is also free to consider any other factors it deems relevant to its assessment of the economic realities,'" and it "need not decide that *every* factor weighs against joint employment" to grant summary judgment in favor of the putative joint employer.  *Id.* (quoting *Zheng*, 355 F.3d at 72-73, 75-77).

### B.   Plaintiffs Cannot Create Issues of Fact With Errata Sheets Substantively Changing or Contradicting Their Deposition Testimony.

Each Plaintiff who sat for a deposition submitted an errata sheet to address what they claim in most instances to be a "transcription error" or to "provide clarification and to make the record clear."  Together, these errata sheets comprise an astounding 81 pages.[18]  Throughout the course of these depositions, Plaintiffs' counsel frequently injected on-record commentary forecasting Plaintiffs' improper use of errata sheets.  *See, e.g.*, Ex. 20, Grant Dep. 58:10–62:10 ("Attorney Huot: We're just going to submit the completed answer in an errata sheet."); Ex. 22, J.F. Pierre Dep. 117:23–118:25 ("Ms. Huot: Hold on.  Let me mark my objection.  You have a talk with him. We'll provide the answer in an errata sheet.  Go ahead."), 190:10–191:9 ("Ms. Huot: Objection to form.  Let him answer the question, and we'll provide it in the errata sheet."), 209:18–210:11 ("Ms. Huot: Regardless of Mr. Parlo's instruction, you can provide the testimony how you'd like. And if he keeps interrupting you, we'll just provide it in an errata sheet."), 233:20–234:22 ("Ms. Huot: Objection to form.  You know he's testified about other work that he's done.  You're

---

[18]   Piney Errata—4 pages; Rivera Errata—5 pages; Gamez Errata—2 pages; Grant Errata—1 page; Cutrone Errata—2 pages; J.F. Pierre Errata—11 pages; J. Martinez Errata—2 pages; Flores Errata—2 pages; Walls Errata—7 pages; Phillip Errata—8 pages; Vaval Errata—4 pages; Faysal Errata—4 pages; B. Pierre Errata—18 pages; R. Martinez Errata—3 pages; Diaz Errata—2 pages; Loomis Errata—3 pages; Theophile Errata—3 pages).  *See* Exs. 12-30.

just mischaracterizing his testimony. You're—whatever. We'll provide it in the errata."), 283:13-25 ("Ms. Huot: Officer Pierre, we're going to provide the full answer in an errata sheet—"), 374:5–375:3 ("Ms. Huot: All right. We'll fill it in the errata sheet later."); Ex. 30, Walls Dep. 57:1-16 ("Attorney Huot: It's just you're not getting any testimony because we're just going to provide clarification in an errata sheet."); Ex. 24, Phillip Dep. 105:23–106:9 ("Ms. Huot: The document says—she's literally telling you what the document says. We can fill it in on the errata sheet."), 106:10-15 ("Ms. Huot: That's literally what she is testifying about. Please continue testifying, or we'll just write it in later."), 191:21–195:17 ("Ms. Huot: Okay. Then we will provide the complete answer in an errata sheet."); Ex. 17, Faysal Dep. 103:3–104:25 ("Ms. Huot: We are going to be filling in this answer in an errata sheet."), 107:3-17 ("Ms. Huot: . . . So we'll be filling that in in the errata sheet."), 125:18–19 ("Ms. Huot: I just wanted to note for the record that we're going to be filling into the errata sheet . . ."); Ex. 26, R. Martinez Dep. 56:14–58:9 ("Ms. Huot: He just said I can tell you one thing. We can add it in the errata sheet later. . . ."; "Ms. Huot: "Okay. We'll provide the answer in an errata sheet."), 130:12–132:2 ("Ms. Huot: No problem. We're going to go ahead and put that answer in the errata sheet then, just so you know."), 154:3-9 ("Ms. Huot: We'll provide the answer in the errata sheet."), 154:14–155:2 ("Ms. Huot: Okay. We will provide the full answer in the errata sheet.").

While Rule 30(e) allows a deponent to make "changes in form or substance" to their testimony and to "attach any changes the deponent makes" to the filed transcript, Fed. R. Civ. P. 30(e), a plaintiff is "not entitled to have his altered answers take the place of the original ones." *Podell v. Citicorp Diners Club, Inc.*, 914 F. Supp. 1025, 1034 (S.D.N.Y.1996), *aff'd*, 112 F.3d 198 (2d Cir. 1997). Instead, when a party amends his testimony under Rule 30(e), "[t]he original answer to the deposition questions will remain part of the record and can be read at the trial[,]" and the

25

"changed answers bec[o]me [simply a] part of the record generated during discovery." *Podell*, 112 F.3d at 103 (internal quotations and citation omitted). Further, "at the summary judgment stage, a district court is 'on firm ground' if it does not credit an [errata] sheet that reflects a party's attempt to 'retrieve the situation by scratching out and recanting his original testimony. . . .'" *Barnes v. Ross*, No. 12 Civ. 1916(PKC), 2014 WL 1329128, at *11 (S.D.N.Y. Apr. 3, 2014) (quoting *Podell*, 112 F.3d at 103); *Escoffier v. City of New York*, No. 13-CV-3918 (JPO), 2019 WL 4747666, at *4 (S.D.N.Y. Sept. 30, 2019) ("Here, many of Escoffier's substantive changes would materially alter the implication of his initial testimony. . . . Given the clarity of Escoffier's initial testimony, the errata sheet appears to be an attempt to recant his original testimony and thus, the Court does not consider it."). *See also Musto v. Transport Workers Union of America, AFL-CIO*, No. 03-CV-2325 (DGT) (RML), 2009 WL 116960, at *2 (E.D.N.Y. Jan. 16, 2009) (recognizing that the Local Civil Rules are designed to ensure that deposition testimony "is completely that of the deponent, rather than a version of that testimony which has been edited or glossed by the deponent's lawyer."); *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992) (ordering changes to deposition testimony in errata deleted, holding that "Rule [30(e)] cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. . . . A deposition is not a take home examination.").[19]

---

[19] Should Plaintiffs' claims survive summary judgment and proceed to trial, Bloomberg and GardaWorld reserve all rights with respect to the circumstances surrounding Plaintiffs' errata sheets and the process by which those errata sheets were prepared, including the right to seek discovery concerning communications with Plaintiffs' counsel relating to the preparation of the errata sheets under any applicable waiver, at-issue, crime-fraud, or other exception doctrines. "[Opposing] counsel has the right to ask about matters that may have affected or changed the witness's testimony." *Wade Williams Distribution, Inc. v. Am. Broad. Companies, Inc.*, No. 00 CIV. 5002 (LMM), 2004 WL 1487702, at *1 (S.D.N.Y. June 30, 2004). This is particularly true where there are claims of improper interference or coaching by the deponent's attorney.

A district court should weigh the "*totality of the evidence*" in considering whether the alteration to prior testimony creates an issue that must be determined by a jury. *Barnes*, 2014 WL 1329128, at *11 (quoting *Podell*, 112 F.3d at 103 (emphasis in original)). Accordingly, the Court should fully credit Plaintiffs' original deposition testimony in its consideration of the complete evidentiary record. Given the totality of the evidence, a reasonable jury could not conclude that Plaintiffs' errata sheets raise any genuine issues of material fact. *Barnes*, 2014 WL 1329128, at *12 (based on totality of the evidence that the plaintiff's errata sheet did not raise an inference of discriminatory intent by any defendant, granting summary judgment in the defendant's favor); *Amarosa v. Am. Nat'l Red Cross*, No. 11-CV-3289(DRH)(WDW), 2014 WL 3696255, at *7 (E.D.N.Y. July 24, 2014) ("plaintiff's effort to recant her original testimony" in an errata sheet "does not weigh enough in the balance to create an issue of fact for a jury"; granting summary judgment in the defendant's favor).

### C.    Neither Bloomberg Nor GardaWorld Exercises Formal Control Over Plaintiffs.

#### 1.    Bloomberg and GardaWorld Do Not Have the Power to Hire or Fire Plaintiffs.

Under the first *Carter* factor, the Court must consider whether Bloomberg and GardaWorld have the power to hire and fire Plaintiffs. They do not.

As to hiring, the evidence demonstrates that the NYPD is solely responsible for making individual hiring decisions. Bloomberg and GardaWorld do not recruit Officers to participate in the PDP, receive or review applications from Officers, or interview Officers before they may select to work paid details at Bloomberg. To the contrary, the NYPD is exclusively responsible for hiring

---

*Musto*, 2009 WL 116960, at *2 (allowing the plaintiffs to explore and to question a witness, either in another deposition or at trial, about the witness's meeting with his lawyer and why his testimony changed on cross-examination).

Officers, setting eligibility requirements, and approving Officers to participate in the PDP. It is then up to the Officers to voluntarily select whatever paid details they wish, at Bloomberg or any other vendor. *Jean-Louis*, 838 F. Supp. 2d at 123 (defendant did not have the power to hire where it did not receive applications from subcontractor's technicians, interview or review applicants, notify applicants that they had been hired, or provide new hires with employment forms).

Similarly, the NYPD has the exclusive authority to suspend or remove Officers from the PDP or to fire them altogether. Although Bloomberg may, and on some occasions did, request that a particular Officer not be permitted to return to its premises, this alone does not weigh in Plaintiffs' favor.[20] In the subcontractor context, the power to remove workers from a specific project does not alone establish the power to fire. Rather, the putative joint employer must have the power to terminate the workers' employment with the subcontractor altogether or to prevent the putative employee from working for another company working on the same project. *Lawrence v. Adderley Indus., Inc.*, No. CV-09-2309 (SJF)(ETB), 2011 WL 666304, at *3, 8 (E.D.N.Y. Feb. 11, 2011) (Cablevision's power to "direct Adderley not to assign an individual who . . . had been disciplined or fired for bad performance to a Cablevision project" or to "remove[ ] technicians from its list of approved workers" did not constitute formal control; there was no genuine dispute that "Cablevision did not . . . have the power to hire and fire . . . technicians"); *Jean-Louis*, 838 F. Supp. 2d at 124 (distinguishing between the power to fire and "power to 'de-authorize' any Metro technician from installing Time Warner services . . . while employed by Metro."); *Godlewska v. HDA*, 916 F. Supp. 2d 246, 258 (E.D.N.Y. 2013), *aff'd sub nom. Godlewska v. Human Dev. Ass'n, Inc.*, 561 F. App'x. 108 (2d Cir. 2014) (granting agency's summary judgment motion on the ground that it was not a joint employer; distinguishing between the agency's power to direct the

---

[20]   GardaWorld did not make such requests, nor did it have the authority to do so.

contractor to remove a home attendant from a particular patient's case and the power to terminate the home attendant); *Vasto v. Credico (USA) LLC*, No. 15 Civ. 9298 (PAE), 2017 WL 4877424, at *8-9 (S.D.N.Y. Oct. 27, 2017), *aff'd,* 767 F. App'x 54 (2d Cir. 2019) ("This residual authority to 'deactivate' agents . . . has been held not to demonstrate joint employer control.").

Here, a request by Bloomberg that an Officer not work future details at its locations does not impact that Officer's eligibility to work paid details for other vendors, which necessarily means it also has no impact on that Officer's employment status with the NYPD or the PDP itself.  There is no evidence in the record that Bloomberg or GardaWorld has the authority to make any individual hiring and firing decisions with respect to Plaintiffs or any other Officers.  Absent such evidence, this factor weighs against a finding of joint employment.  *Arce v. Sovereign Indus. Grp. Inc.*, No. 19-CV-489 (NGG)(JRC), Dkt. 134 at p.18-19 (E.D.N.Y. June 14, 2024).

## 2.    Bloomberg and GardaWorld Do Not Control Plaintiffs' Work Schedules or Terms and Conditions of Employment.

Under the second *Carter* factor, the Court must consider whether Bloomberg and GardaWorld have supervised and controlled the plaintiffs' work schedules or conditions of employment. *Carter*, 735 F.2d at 12.  They have not.

Bloomberg and GardaWorld have no control over which Officers participate in the PDP, which Officers choose to work paid detail shifts at Bloomberg and how frequently they do so, or whether or when an Officer will show up for a requested paid detail at all.  The selection and scheduling of Bloomberg paid details is a decision left to eligible Officers' discretion, within the parameters set by the NYPD and through the NYPD's internal assignment system.  To cancel a previously scheduled detail, Officers must either use the NYPD's system or cancel directly with the Paid Detail Unit, not Bloomberg and GardaWorld.  *Jean-Louis*, 838 F. Supp. 2d at 126 (finding that Time Warner did not control work schedules where it was "undisputed that Metro tells its

29

technicians when to report in the morning; that technicians contact Metro if they are running late or will be absent; and that no Plaintiff ever contacted Time Warner about those issues"); *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 425 (S.D.N.Y. 2017) (defendant did not control work schedules where employees were assigned to particular locations by defendant's subcontractor, notified subcontractor when they were sick or would otherwise miss work, and never spoke to defendant about their jobs, duties, or work hours).

As the inquiry under the second *Carter* factor is "largely the same" as that under the fifth *Zheng* factor, courts often consider them together. *See Arce*, 2025 WL 102449, at *8; *Martin*, 273 F. Supp. 3d at 433; *Jean-Louis*, 838 F. Supp. 2d at 126 n.7. "Because the *Zheng* factors are the most relevant in subcontractor relationships such as the one at issue here," *Arce*, No. 19-CV-489 (NGG)(JRC), Dkt. 134 at p. 19, Bloomberg's and GardaWorld's lack of control and the absence of supervision over Officers are addressed more fully in connection with the fifth *Zheng* factor.

### 3.    Bloomberg and GardaWorld Did Not Determine Plaintiffs' Rate or Method of Payment.

The third *Carter* factor considers whether Bloomberg and/or GardaWorld "determined the rate and method of payment." *Carter*, 735 F.2d at 12. They did not.

The non-negotiable Paid Detail Agreement that Bloomberg was required to sign sets forth a schedule of hourly rates based upon officer rank that are subject to change by the NYPD, with no input by Bloomberg. The Paid Detail Agreement also dictates the specific form and manner of payment and mandates that the Paid Detail Unit act as intermediary for delivery of payment to Officers. The NYPD prohibits Bloomberg from paying Officers directly. Once Bloomberg transmits the checks to the Paid Detail Unit, it has no control over when or how the Officers receive those checks from the NYPD. GardaWorld is not a party to the Paid Detail Agreement and has no role whatsoever in the payment of Officers.

30

Bloomberg's agreement to pay contractually-mandated rates for paid details is irrelevant. The determining factor is that the NYPD, not Bloomberg or GardaWorld, set those rates and made all decisions regarding the rate and method of payment. Bloomberg and GardaWorld indisputably did not make those decisions; there is no evidence in the record to suggest otherwise. As such, this factor strongly weighs against a finding of joint employment. *See Jean-Louis*, 838 F. Supp. 2d at 129-30 ("[T]he test is whether a putative joint employer determines pay rates, not whether it affects them."); *Arce*, No. 19-CV-489 (NGG)(JRC), Dkt. 134 at p. 20 (factor weighed against joint employment where, "the amounts [paid] may have been impacted by the amount of labor performed, [but] there is no evidence that Sovereign determined *individual* employees' pay").

### 4.    Bloomberg and GardaWorld Do Not Maintain Plaintiffs' Employment Records.

The final *Carter* factor considers whether Bloomberg and GardaWorld are primarily responsible for maintaining Plaintiffs' employment records, "which include [ ] employee[s'] personnel files, time sheets, pay stubs, and government employment forms." *Hugee v. SJC Group, Inc.*, No. 13-CV-0423 (GBD), 2013 WL 4399226, at *7 (S.D.N.Y. Aug. 14, 2013). They are not.

Bloomberg collects only two documents from Officers who work paid details: a copy of the NYPD-issued Paid Detail Card and a W-9 form. The Paid Detail Card serves as an invoice; most of the information listed therein is not even relevant to Bloomberg. The W-9 form provides tax information to facilitate Bloomberg's issuance of 1099 forms to Officers, as mandated by the Paid Detail Agreement.[21] Although the Paid Detail Card and Attendance Sheet contain information regarding Officers' hours of work, there is no evidence to suggest that Bloomberg used

---

[21] Bloomberg's maintenance of attendance logs (also provided by the NYPD) is also an NYPD-imposed requirement; Bloomberg does not review the attendance log, as NYPD supervisors do from time to time.

31

these records for any purpose other than to verify the amount it was contractually obligated to pay. *See Lawrence*, 2011 WL 666304, at \*9 (records reflecting technicians' arrival and departure times was used only "to ensure that [the putative employer] receives the services for which it is entitled."); *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 692 (D. Md. 2010) ("While the retention of these records [showing arrival and departure data for each cable technician] might on the surface seem to evidence an employment relationship, upon closer scrutiny the retention of the records is only an extension of Comcast's [quality] control procedures."). There is no evidence that Bloomberg or GardaWorld maintained personnel records, paystubs, or government employment forms for Officers. Therefore, this factor weighs against a finding of joint employment. *Jean-Louis*, 838 F. Supp. 2d at 130 (factor weighed against finding of joint employment when putative employer did "not maintain personnel files for individual employees" or "government employment forms"); *see also Godlewska*, 916 F. Supp. 2d at 262 (factor weighed against joint employment when "maintaining employment records is primarily [subcontractor's] responsibility).

* * *

Because all four *Carter* factors weigh against joint employment, the Court should conclude that, as a matter of law, Bloomberg and GardaWorld did not exercise formal control over Plaintiffs.

### D. Neither Bloomberg Nor GardaWorld Has Exercised Functional Control Over Plaintiffs.

#### 1. Plaintiffs Primarily Use NYPD Equipment To Perform Paid Detail Work.

The first *Zheng* factor addresses plaintiffs' use of the putative joint employer's premises and equipment. *Zheng*, 355 F.3d at 72. The "Second Circuit has cautioned that 'shared premises' are not 'anything close to a perfect proxy for joint employment (because they are . . . perfectly consistent with a legitimate subcontracting relationship). . . ." *Jean-Louis*, 838 F. Supp. 2d at 131

32

(citing *Zheng*, 355 F.3d at 72). Bloomberg and GardaWorld do not dispute that Plaintiffs' presence on Bloomberg's premises is necessary for the NYPD to perform its contractual obligations under the Paid Detail Agreement. That is, after all, the primary purpose of the Paid Detail Program. The unremarkable fact of Plaintiffs' mere presence on Bloomberg's premises says nothing about whether Bloomberg or GardaWorld controlled Plaintiffs or any other Officers during paid details.

There is no genuine dispute that the Officers perform paid details wearing their full NYPD uniform and equipped with all of their standard NYPD-issued gear—including their NYPD radio, gun belt, and firearm—signaling their independence from Bloomberg and GardaWorld. *Gitter*, 2015 WL 5710454, at *5 (finding no joint employment where, among other factors, "signaling his independence from Target, Jean-Pierre wore the NYPD uniform and used the NYPD's equipment"). That signaled independence and status as an NYPD Officer is the core value the PDP provides to Bloomberg and other participating vendors. The only equipment Bloomberg provides to Officers for use during paid details is a radio tuned to a frequency that enables Officers to maintain situational awareness and maintain communication with other security personnel. Officers' use of one piece of Bloomberg equipment is insufficient to tip this factor in favor of finding joint employment. Rather, "the fact that [Bloomberg] provides that lone piece of equipment is overwhelmingly outweighed by what [Bloomberg] does not provide[.]" *Jean-Louis*, 838 F. Supp. 2d at 132. GardaWorld provides no equipment to Officers at all. Therefore, the first functional control factor weighs against a finding of joint employment.

### 2.    The NYPD and Plaintiffs Freely Provided Paid Detail Services To Numerous Other Businesses Through the PDP.

The second *Zheng* factor asks "whether the putative joint employees are part of a business organization that shifts as a unit from one putative joint employer to another." *Zheng*, 355 F.3d at 72. This factor "is relevant because a subcontractor that seeks business from a variety of

contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client." *Id.*

The NYPD's relationship with Bloomberg through the PDP is by no means exclusive; GardaWorld has no relationship at all with the NYPD. The undisputed evidence shows that the NYPD contracts with and provides paid detail services to myriad private entities throughout New York City[22], and Officers regularly select paid details for a wide variety of vendors. Therefore, this factor weighs against a finding of joint employment. *Jean-Louis*, 838 F. Supp. 2d at 132-33 (holding that the second *Zheng* factor does not weigh in favor of finding that Time Warner jointly employed plaintiffs where Metro has employed other subcontractors in the past and "can seek work from any other cable company at any time"). *Cf. Greenawalt*, 642 F. App'x at 38 (a material question of fact existed as to the second *Zheng* factor where putative joint employer "existed only to serve AT & T" and "sent all of its guards to AT & T's stores").

### 3. Plaintiffs Did Not Perform A Discrete Line Job Integral to Bloomberg's Business.

The third *Zheng* factor examines "the extent to which plaintiffs performed a discrete line-job that was integral to [the purported joint employer's] process of production." *Zheng*, 355 F.3d at 72. Accordingly, courts consider this factor on a spectrum:

> [o]n one end of the spectrum lies . . . piecework on a producer's premises that requires minimal training or equipment, and . . . [o]n the other end of the spectrum lies work that is not part of an integrated production unit, that is not performed on a predictable schedule, and that requires specialized skills or expensive technology.

---

[22] *See Piney v. City of New York et al.*, No. 1:25-CV-671 (DEH) (SLC), Dkt. 631 (S.D.N.Y. Mar. 11, 2026) (naming 178 entities as defendants in a virtually identical action as putative joint employers with the City and NYPD based on their alleged participation in the PDP).

*Zheng*, 355 F.3d at 73.[23]

The paid detail service Officers perform is separate and distinct from the services and products Bloomberg offers.  Officers possess specialized skills acquired through extensive NYPD training.  At all times, including on paid details, Officers carry full law enforcement power.[24]  The primary function of Officers on paid details at Bloomberg is to provide a uniformed NYPD security presence.  While the service Officers provide to Bloomberg through the PDP is important to Bloomberg because it enhances security coverage at its premises and reduces NYPD response time in the event of an emergency, there is no evidence in the record to support that the service is "integral" to Bloomberg's business of providing financial software tools, enterprise applications and order management systems for the institutional marketplace, as well as news through various media to financial companies and organizations.  *See Monzano-Morano v. Libqual Fence Co.*, No. 18-CV-0161(MKB)(AKT), 2021 WL 730663, at *15 (E.D.N.Y. Feb. 5, 2021), *r. & r. adopted*, 2021 WL 688295 (E.D.N.Y. Feb. 23, 2021).  Nor is there any evidence that Bloomberg derives any revenue from the services Officers provided through the Paid Detail Program.  *Id.* ("[W]here . . .the work performed is more comparable to a service, rather than a discrete line job, the third functional control factor does not weigh in favor of finding joint employment, even if the work performed may in some sense be integral to the putative joint employer because revenue is derived from it."); *see also Vasto*, 2017 WL 4877424, at *14 ("The facts here do not signal joint employment.  To be sure field agents' work is in some sense integral to Credico's business: field agents

---

[23]   Some courts have "questioned whether this factor translates well outside of the production line employment situation." *Godlewska*, 916 F.Supp.2d at 263 (citation modified); *see Jean-Louis*, 838 F. Supp. 2d at 134 ("[T]he third factor might apply with somewhat less vigor where, as here, the parties are engaged in providing a service rather than manufacturing a product").

[24]   By contrast, neither Bloomberg's Security Operations personnel nor GardaWorld employees at Bloomberg's New York City locations can do what NYPD Officers are authorized to do as law enforcement officers.

solicit customers, and Credico ultimately derives its revenue from those face-to-face interactions. But the marketing and outreach services that the field agents provide are ultimately just that, services, rather than discrete line jobs."). This factor weighs against a finding of joint employment.[25]

### 4.     Transfer of Responsibility

The fourth *Zheng* factor examines whether "responsibility under the contracts could pass from one subcontractor to another without material changes." *Zheng*, 355 F.3d at 74. This factor "asks not whether all of the putative joint employer's contractors do the same work but whether, if the putative joint employer hired one contractor rather than another, 'the *same* employees would continue to do the *same* work in the *same* place.'" *Jean-Louis*, 838 F. Supp. 2d at 135 (quoting *Zheng*, 355 F.3d at 74) (emphasis in original). Stated differently, the key question is: if either Bloomberg or the NYPD were to sever their contractual relationship—*e.g.*, if Bloomberg were to cease participating in the Paid Detail Program—could Officers continue to perform the same uniformed paid detail services for Bloomberg? All of the evidence in the record points to only one answer: No.[26]

---

[25]     *Greenawalt* does not compel a different conclusion. In *Greenawalt*, the Second Circuit found that there was a question of material fact as to whether the third *Zheng* factor weighed against joint employment for security guards placed at various retail locations. *Greenawalt*, 642 F. App'x at 38-39. The Circuit noted that although the responsibilities of the guards differed from those of ordinary employees, which indicated "specialized skills" that may weigh against joint employment, testimony from some guards that they understood their role to include functions similar to those of the direct retail employees, including "greeting customers and otherwise assisting store managers" and "letting employes into stores in the morning and escorting them out in the evenings" led the Court to find that a "conclusion [regarding joint employment on this factor] [was] not warranted as a matter of law." *Id.* Here, the primary function of Officers on paid details at Bloomberg is simply to provide a uniformed NYPD security presence. There is no evidence in the record that Officers providing paid detail services at Bloomberg had responsibility for greeting Bloomberg clients or employees or letting employees into the building.

[26]     GardaWorld has no contract with the NYPD for any services, so the possibility of having responsibility for providing paid detail services pass from the NYPD to another subcontractor for GardaWorld is nonexistent.

36

There is no dispute that the PDP is the only authorized program for businesses, including Bloomberg, to have off-duty NYPD police officers perform uniformed security work. Indeed, the NYPD prohibits Officers from working for participating businesses, including Bloomberg, outside of the PDP. Accordingly, this factor weighs against finding joint employment. *Arce*, No. 19-CV-489, Dkt. 134 at p. 28 (where the record did not indicate that plaintiffs would continue to work for the putative joint employer's sites in the absence of their relationship to the subcontractor, concluding this factor weighed against finding joint employment); *Monzano-Moreno*, 2021 WL 730663, at *16 (finding no evidence that a fence installer's employees would consider installing fences for the putative joint employer if the contractor/subcontractor relationship was severed).

### 5. Neither Bloomberg Nor GardaWorld Has Supervised the Paid Detail Work of Plaintiffs and Other Officers.

The fifth *Zheng* factor asks to what degree "the defendants supervise the plaintiff's work." *Zheng*, 355 F.3d at 74-75. The Second Circuit has cautioned that to avoid misinterpreting this factor "to encompass run-of-the mill subcontracting relationships," courts must look for extensive supervision such that "it demonstrates effective control of the terms and conditions of the plaintiff's employment." *Id.* at 74-75. "[S]upervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry" because that "is perfectly consistent with a typical, legitimate subcontracting arrangement." *Id.* at 75. "[I]ncidental control over the results produced without further indicia of control over the means employed to achieve the results" does not establish an employment relationship. *Gitter*, 2015 WL 5710454, at *5.

Accordingly, courts have made the following distinction: a finding of joint employment is not warranted "where the putative joint employer maintains specific standards to which its contractors and the contractors' employees must adhere, and regularly monitors the contractor's employees to ensure that their performance satisfied the putative joint employer's expectations[.]"

*See Monzano-Moreno*, 2021 WL 730663, at *11 (citation modified); *see also Jean-Louis*, 838 F. Supp. 2d at 128 (concluding that communicating with workers does not constitute "control over the work or working conditions of the employee[s]"); *Vasto*, 2017 WL 4877424, at *9-11 (factor strongly favored the defendant because although "joint employer status may be found even where control is exercised only occasionally . . . evaluation and monitoring to ensure productivity and compliance is not tantamount to control") (citation modified). Bloomberg and GardaWorld do not exercise sufficient control over Officers or the manner in which they perform paid details to permit a finding that they are employers of Plaintiffs or any other Officers.

Bloomberg does not dispute that it decides how to use uniformed NYPD Officers on paid details in the way that best meets Bloomberg's security needs. GardaWorld has no input into this decision. Bloomberg also does not dispute that it relays basic information (*e.g.*, building layout and access, ingress and egress points, communication with other security personnel) and instructions (*e.g.*, high visibility posts, vigilance, extended break times) to Officers to facilitate the fulfillment of those needs. GardaWorld employees occasionally pass this information from Bloomberg to Officers. Bloomberg also does not dispute that if an Officer does not provide the quality of service Bloomberg expects—such as not exercising a high level of vigilance or leaving the area designated for patrol—Bloomberg may remind the Officer of its expectations and, if necessary, report sub-par service to the NYPD's Paid Detail Unit.[27] All these facts show is that Bloomberg "makes efforts to ensure that" the NYPD, through its Officers, "is providing quality service; the evidence does not show that [Bloomberg] controls the day-to-day manner in which [Officers] provide that service." *Jean-Louis*, 838 F. Supp. 2d at 127; *see also Godlewska*, 916 F. Supp. 2d at

---

[27] GardaWorld do not make such reports to the NYPD.

38

259 ("Exercising quality control by having strict standards and monitoring compliance with those standards does not constitute supervising and controlling employees' work conditions.").

There is no evidence that Bloomberg or GardaWorld involve themselves in the "day-to-day" management of Officers who perform paid details at Bloomberg's premises. *Jean-Louis*, 838 F. Supp. 2d at 127 (granting summary judgment to defendant, contrasting efforts to ensure quality service with controlling the "day-to-day manner" in which employees provide the service); *Jacobson*, 740 F. Supp. 2d at 691 (contrasting "maintain[ing] specific standards to which the [contractors] and technicians must adhere, and regularly monitor[ing] the technicians to ensure that their performance satisfies . . . expectations" with being "responsible for the day-to-day management of the technicians"). Bloomberg and GardaWorld do not: require or receive reports from Officers; inspect Officers' uniforms and activity logs; provide Officers performance reviews; or discipline Officers. Those supervisory responsibilities fall entirely to the NYPD. The NYPD trains its Officers, assigns NYPD supervisors to inspect Officers on paid details, and handles Officer discipline. Further, the NYPD's Paid Detail Unit, not Bloomberg and not GardaWorld, fields Officer inquiries about paid detail payments and reviews documentation to resolve Officer suspensions by the NYPD from the PDP. Based on this evidence, Bloomberg and GardaWorld do not control or supervise Plaintiffs' or other Officers' working conditions. *Godlewska*, 916 F. Supp. 2d at 260 (City Defendants did not control or supervise home attendants' working conditions where the agency employer, conducted supervision, evaluated performance, handled disciplinary issues, and accepted home attendants' complaints concerning working conditions). This factor weighs against a finding of joint employment.

###### 6.    Plaintiffs and Other Officers Do Not Exclusively or Predominantly Work for Bloomberg or GardaWorld Through the PDP.

The sixth *Zheng* factor considers whether the plaintiffs "worked exclusively or predominantly for the putative joint employer." *Zheng*, 355 F.3d at 75.  This factor will weigh in favor of a finding of joint employment "[w]hen plaintiffs perform labor only for the purported joint employer during the relevant time period," *Arce*, 2025 WL 102449, at \*13, or when plaintiffs "spend[] 40 or more hours of a work week at one worksite." *Id.*  Neither situation applies here.

Officers are free to choose which, if any, details they wish to work at Bloomberg or any of the many other businesses participating in the PDP.  In fact, many Officers work paid details for numerous other vendors.  Bloomberg and GardaWorld do not control: which Officers participate in the PDP; which Officers select paid details at Bloomberg; whether or when an Officer will show up for a requested paid detail; or how frequently any Officer works paid detail shifts at Bloomberg.  For example, Burbran Pierre performed a single eight-hour paid detail at Bloomberg in September 2019.  BB ¶ 165.  Opt-in plaintiff Piney has worked approximately 500 PDP shifts but only "about 20 to 30 shifts at Bloomberg."  Ex. 25, Piney Dep. 16:13-19.  Opt-in plaintiff Gamez has worked "about 600" PDP shifts but only one paid detail at Bloomberg.  Ex. 19, Gamez Dep. 24:1-4, 25:21-23.[28]  Accordingly, this factor also weighs against a finding of joint employment.

---

[28]    *See also* Ex. 20, Grant Dep. 19:23-20:3, 22:7-9 (worked "more than 250" PDP shifts but only "two" at Bloomberg); Ex. 14, Cutrone Dep. 16:20-22, 23:2-5 (worked "30 to 40" PDP shifts but only "two" at Bloomberg);  Ex. 21, J. Martinez Dep. 23:6-9, 28:3-5 (worked "roughly 200" PDP shifts but only worked "one time" at Bloomberg); Ex. 18, Flores Dep. 25:1-3, 26:9-11 (worked "[t]hirty to 40" PDP shifts but only "three" at Bloomberg); Ex. 15, Diaz Dep. 26:1-4, 31:6-9 (worked "over 500" PDP shifts but only one at Bloomberg); Ex. 28, Theophile Dep. 34:20-25, 38:10-12 (Theophile has worked "[m]ore than 400" PDP shifts but only "two" at Bloomberg).

* * *

On balance, the *Zheng* factors do not support a conclusion that Bloomberg and GardaWorld jointly employed Plaintiffs. The Court should conclude that, as a matter of law, Bloomberg and GardaWorld did not exercise functional control over Plaintiffs and other Officers in the PDP.

### E.     All of the Formal and Functional Control Factors Weigh Against a Finding of Joint Employment.

The totality of the evidence in this case enables the Court to "conclude that, even where both the historical facts and the relevant factors are interpreted in the light most favorable to plaintiffs, [Bloomberg and GardaWorld] are still entitled to judgment as a matter of law."[29] *Zheng*, 355 F.3d at 76. In totality, the evidence addressing the formal and functional control factors under *Carter* and *Zheng* supports only one conclusion: that a rational factfinder could not find that Bloomberg and/or GardaWorld were joint employers of the NYPD Officers who provided services to Bloomberg through the PDP. Because Bloomberg and GardaWorld neither formally nor functionally controlled NYPD Officers, including Plaintiffs, Bloomberg and GardaWorld cannot be held liable for the claimed FLSA and NYLL violations as joint employers.

Further, GardaWorld's contractual relationship is exclusively with Bloomberg—not with the NYPD or the Officers. Notwithstanding this undisputed lack of any formal relationship, this Court has identified specific indicia of control over PDP officers, which, if demonstrated by the facts elucidated in discovery, could theoretically support a joint employer theory—either using the *Carter* or *Zheng* analysis. These include: posting solicitations for paid details, hiring and firing Officers, providing equipment, using Officers on a defendant's premises, controlling schedules, issuing payments, barring particular Officers from future paid details, having the authority to direct

---

[29]   "To reach that conclusion, the Court need not decide that *every* factor weighs against joint employment." *Id.* at 76-77.

41

Officers in the performance of their duties, setting break policies, maintaining records, and/or reporting officer misconduct to the NYPD.  GardaWorld performs none of these functions with respect to Officers.  It does not pay them, schedule them, train them, discipline them, or maintain their employment records.  The undisputed material facts clearly demonstrate that GardaWorld has no formal or informal control over Officers performing paid details.  Simply put, the undisputed material facts demonstrate conclusively that GardaWorld is not a joint employer of the Officers under any cognizable legal theory.

III.    SUMMARY JUDGMENT IN BLOOMBERG'S AND GARDAWORLD'S FAVOR, AND ALTERNATIVELY, DISMISSAL, IS WARRANTED AS TO PLAINTIFFS' FIFA CLAIMS.

In the alternative to their FLSA and NYLL claims, Plaintiffs assert claims under the Freelance Isn't Free Act for late payment of compensation.  The Court should grant summary judgment in Bloomberg's and GardaWorld's favor on these claims.

A.    The FIFA Claims Fail Because Bloomberg and GardaWorld Are Not Hiring Parties and NYPD Officers Are Not Freelance Workers.

If the Court exercises jurisdiction over the FIFA claims, it should enter summary judgment in favor of Bloomberg and GardaWorld because the Freelance Isn't Free Act does not apply to Officers performing paid detail services through the NYPD-sanctioned Paid Detail Program.

"FIFA regulates the relationship between freelance workers and those who retain their services, the hiring party, in New York City." *Monzano-Moreno*, 2021 WL 730663, at *18 (quotations omitted). "FIFA defines a freelance worker as 'any natural person . . . that is hired or retained as an independent contractor by a hiring party to provide services in exchange for compensation.'" *Varn v. Orchestrade, Inc.*, No. 19-CV-2875 (MKB), 2022 WL 900855 at *6 (E.D.N.Y. Mar. 28, 2022) (quoting N.Y.C. Admin. Code § 20-927).  The statute defines a "hiring party" as "any person

42

who retains a freelance worker to provide any service" with certain exceptions not applicable here. N.Y.C. Admin. Code § 20-297.

As the statute "provides no guidance on how to assess the application of FIFA," the Court must consider the purpose and intent of the law in light of the circumstances before it. *Turner v. Sheppard Grain Enters., LLC*, 127 N.Y.S.3d 260, 262-63 (Sup. Ct. N.Y. Cnty. 2020). The record evidence here compels the conclusion that Bloomberg and GardaWorld are not a "hiring party" and NYPD Officers are not "freelancers" within the meaning of FIFA.

Neither Bloomberg nor GardaWorld has "engaged" or "retained" any Plaintiff or Officer to provide paid detail services. There is no dispute that Bloomberg, after obtaining NYPD approval, entered into a contract with the NYPD—and not any individual Officer—to participate in the PDP for paid detail services. Bloomberg and GardaWorld have no relationship, contractual or otherwise, with any Officer; in fact, the Paid Detail Agreement expressly prohibits direct contact between Bloomberg and Officers to fill or augment paid details at Bloomberg. In other words, the contract between Bloomberg and the NYPD prevents Bloomberg from engaging or retaining any individual Officer at all, and there is no evidence that either Bloomberg or GardaWorld did so.[30]

Plaintiffs and other Officers performing paid detail work through the PDP do not fall within the definition of "freelancer." First, no Plaintiff or Officer has entered into any agreement with Bloomberg or GardaWorld to provide services as one natural person. Quite the opposite: Officers who work paid details at Bloomberg do so exclusively as part of an organization—the NYPD—through the auspices of the PDP.

---

[30] *See also Monzano-Moreno*, 2021 WL 730663, at *17-18 (concluding that the moving defendants were not the plaintiffs' joint employers for purposes of the FLSA and NYLL, and therefore, "for similar reasons," were not the plaintiffs' hiring parties for purposes of FIFA).

Second, the legislative history of FIFA reinforces the conclusion that Plaintiffs and other Officers providing paid detail services through the PDP are not "freelance workers" entitled to the statute's protection. "Freelance workers include independent contractors, part-time moonlighters, full-time self-employed workers and others." Dkt. 62-3, N.Y.C. Comm. on Consumer Affairs, N.Y.C. Council, Committee Report of the Governmental Affairs Division 3-4 (Oct. 26, 2016); Dkt. 62-2, N.Y.C. Comm. On Consumer Affairs, N.Y.C. Council, Council Meeting Minutes at 3381 (Oct. 17, 2016). "Their work ranges from highly specialized professions in the tech, fashion and media industries to event planning, caregiving, housekeeping and more in the rapidly expanding gig economy."[31] *Id.* The impetus behind FIFA was to protect workers not employed by any entity—but rather in business for themselves—from nonpayment and delayed payment for work rendered. *See id.* "The intention is clear: FIFA was passed to ensure that people working in the city are afforded protection in an economy where workers are increasingly hired for discrete or short-term tasks rather than for full-time employment." *Turner*, 127 N.Y.S.3d at 264.

No rational fact-finder could conclude that uniformed New York City police officers—employed with the NYPD, performing off-duty services for private businesses within parameters set exclusively by the NYPD, and at all times carrying full law enforcement power and subject to NYPD rules and regulations—are "freelancers" whom FIFA was designed to protect. Even Plaintiffs do not consider themselves freelancers. BB ¶ 26. Trying to fit Plaintiffs and other Officers into the definition of "freelancer" is like trying to fit a square peg into a round hole. The evidence reflects the absence of any direct engagement or retention of Officers by Bloomberg and

---

[31]     The press release announcing the passage of FIFA mentions "protecting New York City's gig economy" and cited examples of a film producer and a pattern-maker from the Bronx, both of whom didn't get paid after performing freelance work. *Turner*, 127 N.Y.S.3d at 264 (citation omitted).

44

GardaWorld.  For these reasons, the Court should conclude that Plaintiffs' FIFA claims fail as a matter of law.

**B.    Alternatively, Upon Granting Summary Judgment on the FLSA Claims, This Court Should Decline to Exercise Supplemental Jurisdiction Over the FIFA Claims.**

If the Court is not prepared to grant summary judgment in favor of Bloomberg and Garda-World as to Plaintiffs' FIFA claims, it should decline to exercise supplemental jurisdiction over those claims and dismiss them without prejudice.  The doctrine of supplemental jurisdiction is "a doctrine of discretion, not of plaintiff's right."  *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).  In the typical case, once all federal claims have been dismissed, "the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Martin v. Sprint United Mgmt. Co.*, No. 15 Civ. 5237 (PAE), 2017 WL 5028621, at * 4 (S.D.N.Y. Oct. 31, 2017) (citation omitted).  If the Court grants summary judgment as to Plaintiffs' FLSA and NYLL claims, then it should decline to exercise supplemental jurisdiction over Plaintiffs' FIFA claims and dismiss those claims without prejudice, as courts commonly do after awarding defendants summary judgment on all federal claims in a litigation.  *See Shiflett v. Scores Holding Co.*, No. 13 Civ. 4076(NRB), 2014 WL 1413618, at *6 (S.D.N.Y. Apr. 10, 2014), *aff'd*, 601 F. App'x 28 (2d Cir. 2015); *Martin*, 2017 WL 5028621, at *3 (collecting cases).

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Bloomberg and GardaWorld as to all claims over which the Court retains jurisdiction, and dismiss any claims over which the Court elects not to exercise jurisdiction.

Respectfully submitted,

*Paul DeCamp*

ANTHONY A. MINGIONE
BLANK ROME
1271 Avenue of the Americas
New York, New York  10020
Tel:  212.885.5246
anthony.mingione@blankrome.com

*Counsel for Defendant GardaWorld
Security Corporation*

PAUL DECAMP
   Admitted *Pro Hac Vice*
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street, N.W., Suite 700
Washington, D.C.  20037
Tel:  202.861.1819
Fax: 202.861.3571
PDeCamp@ebglaw.com

ADRIANA S. KOSOVYCH
EPSTEIN BECKER & GREEN, P.C.
875 Third Avenue
New York, New York  10022
Tel:  212.351.4500
Fax: 212.878.8600
AKosovych@ebglaw.com

*Counsel for Defendant Bloomberg L.P.*

May 20, 2026